JUDGE WOODS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JACQUELINE FISHER,                            :  **15 CV 00283**

                          Plaintiff,          :

          -against-                           :     15 Ci

AETNA LIFE INSURANCE COMPANY,                 :

                          Defendant.          :     RECEIVED

                                                    JAN 1 5 2015

                                                    U.S.D.C. S.D. N.Y.
                                                    CASHIERS
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

COMPLAINT

Plaintiff Jacqueline Fisher ("Fisher"), by her undersigned attorneys, for her

complaint against defendant Aetna Life Insurance Company ("Aetna"), alleges:

Nature of this Action

1.       Fisher is bringing this action, on behalf of herself and those similarly

situated, to recover damages resulting from Aetna's breach of a group health insurance contract

that was part of an employee welfare benefit plan ("Plan").    In essence, 40 days after Aetna

entered into a health insurance contract to which Fisher was a third-party beneficiary, Aetna

purported to unilaterally alter the terms of that contract to effectively eliminate Aetna's obligation

to provide co-insurance for brand name prescription drugs for which a generic equivalent existed.

Jurisdiction and Venue

2.       The Court has subject matter jurisdiction over the claims in this action

pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(a)(1)(B) and (f), because Fisher is asserting

her rights as a beneficiary of the insurance contract under the Plan.

3.      Venue is appropriate in this District pursuant to 29 U.S.C. § 1132(e)(1)

because the Plan is administered in this District and because Aetna may be found in this District.

The Parties

4.      Fisher is a citizen of the State of New Jersey, residing in Ho-Ho-Kus, New

Jersey.

5.      Aetna is a corporation organized and existing under the laws of the State

of Connecticut, with its principal place of business in Hartford, Connecticut.

The Health Insurance Contract

6.      On or about November 11, 2013, an insurance broker contacted Dunnegan

& Scileppi LLC ("D&S") concerning the availability of health insurance coverage for its

attorneys and staff, as well as their families.

7.      On or about December 8, 2013, the broker provided D&S with a

document, that contained information that Aetna had provided to him, describing an Aetna health

insurance contract designated as "NY Silver OAMC 2000 80/60 HSA PY."

8.      On or about December 18, 2013, D&S submitted an application to Aetna

for that health insurance contract.  D&S also submitted its check no. 1960 for $3,714.55,

representing the first monthly payment that would be due under that contract.

9.      On January 9, 2014, Aetna offered to provide D&S with health insurance

in a document entitled "Final Rates."  The document entitled "Final Rates" defined the health

insurance benefits under the proposed contract.   It specifically provided, *inter alia*, that (i) the

individual deductible for covered services and prescription drugs from in-network providers

("Covered Services") was $2,000,  (ii) after payment of the deductible, benefits for prescription

drugs obtained from an in-network provider required the beneficiary to pay co-insurance of:

2

"$10/$50/50% to $750 max aft ded," and (iii) the individual annual out-of-pocket maximum for Covered Services was $5,000.   The document entitled "Final Rates" further provided "This preliminary rate sheet should be read in conjunction with the more detailed descriptions, exclusions and limitations, and underwriting guidelines contained in your product brochures." No document provided to D&S contained any suggestion that a beneficiary would be required to pay 100% of the difference between a generic and a brand name medication after the deductible had been met.   One sentence in the document entitled "Final Rates" provided "Your member documents will be revised on renewal to clarify that the member payment responsibility for pharmacy claims will be calculated using either the actual discounts and fees paid to participating pharmacies or the amount paid by Aetna to a third party pharmacy benefits service provider."   The document entitled "Final Rates" did not otherwise refer to any document that Aetna intended to deliver to D&S  in the future that would set forth additional, or different, terms of the health insurance contract.

   10. On January 9, 2014, D&S accepted the written offer that Aetna had made. Specifically, D&S executed the document entitled "Final Rates," and returned it to Aetna.  At that time, it became an enforceable contract between Aetna and D&S (the "Contract").  A copy of the Contract is annexed as Exhibit A.  The Contract provided health insurance for all attorneys and  staff of D&S, as well as their family members. This included, D&S partner William Dunnegan ("Dunnegan"), and his wife, Fisher.

   11. On or before January 13, 2014, Aetna negotiated the check no. 1960 for $3,714.55 that D&S had provided to it on December 18, 2013.  (Alternatively, this constituted an acceptance of the offer of D&S set forth in Exhibit A.)

12.     On or before February 5, 2014, D&S delivered to Aetna its check no. 1999 for $3,714.55, representing the second monthly payment due under the Contract.

13.     On or before February 5, 2014, Aetna negotiated check no. 1999 for $3,714.55.

14.     D&S thereafter made each of the 10 additional monthly payments to Aetna due under the Contract.

<u>Aetna's Attempted Unilateral Alteration of the Contract</u>

15.     On or about February 18, 2014, Mark T. Bertolini, Chief Executive Office of Aetna, sent D&S a form letter enclosing a document purporting to be a "Group Accident and Health Insurance Policy," and a "Preferred Provider Organization Certificate of Coverage" (the "Unilateral Alteration").  A copy of the Unilateral Alteration is attached as Exhibit B.

16.     The Unilateral Alteration purported to change the terms of the Contract. For example,  the Unilateral Alteration further provided in its Section XIV Schedule of Benefits:

| PRESCRIPTION DRUGS | Participating Member Responsibility for Cost-Sharing | Non-Participating Member Responsibility for Cost-Sharing | Limits |
|---|---|---|---|
| **Retail Pharmacy** | | | |
| 30 Day Supply Tier 1 | $10 Copayment after Deductible | $10 Copayment 30% Coinsurance after Deductible | See Benefit For Description |
| Tier 2 | $50 Copayment after Deductible | $50 Copayment 30% Coinsurance after Deductible | |
| Tier 3 | 50% Coinsurance up to $750 after Deductible | 50% Coinsurance up to $750 after Deductible | |

The Unilateral Alteration, however, limited the prescription drug benefits under the Contract by providing, for example, at page 39:

> "An additional charge may apply when a Prescription Drug on a higher tier is dispensed at Your or Your Provider's request, when a chemically equivalent Prescription Drug is available on a lower tier unless We approve coverage at the higher tier.  <u>You will have to pay the difference between the cost of the Prescription Drug on the higher tier and the cost of the Prescription Drug on the lower tier.</u>  The cost difference must be paid in addition to the lower tier Copayment or Coinsurance." (Emphasis added.)

17.     The Unilateral Alteration still provided for an individual deductible of $2,000, and an annual out-of-pocket maximum of $5,000, for Covered Services.

18.     Aetna, again, attempted to alter the Contract in a document mailed to D&S on or about August 13, 2014, although this alteration does not appear to impact any of the rights asserted in this action.

Fisher's Claims for Insurance Coverage for EFFEXOR XR®

19.     As of January 1, 2014, Fisher's medical doctor had prescribed the brand name prescription drug EFFEXOR XR®.

20.     At a retail pharmacy within the Aetna network, Fisher purchased EFFEXOR XR®, on or about the following dates, and paid the following amounts, which approximates the retail price of the drug to anyone with a prescription:

| | |
|---|---|
| January 30, 2014, | $348.82; |
| February 26, 2014, | $464.68; |
| April 1, 2014, | $464.68; and |
| April 29, 2014, | $464.68. |

The pharmacy submitted claims to Aetna on behalf of Fisher for those amounts.

21.     For the purchases of EFFEXOR XR® described in the preceding paragraph, Aetna applied the full amount paid for the EFFEXOR XR® to Fisher's individual deductible.

22.     On May 27, 2014, Fisher purchased EFFEXOR XR® for $464.68 at the same pharmacy.  The pharmacy submitted a claim to Aetna on behalf of Fisher for that amount.

23.     For the purchase of EFFEXOR XR® described in the preceding paragraph, Aetna applied $45.97 to Fisher's deductible.  That additional $45.97 satisfied Fisher's individual in-network deductible under the Contract and, if applicable, the Unilateral Alteration. Aetna declined to provide any co-insurance for that purchase of EFFEXOR XR®.

24.     After May 27, 2014, at the same retail pharmacy, Fisher purchased EFFEXOR XR®, on or about the following dates, for the following amounts:

| | |
|---|---|
| June 30, 2014, | $506.40; |
| July 31, 2014, | $506.40; |
| August 27, 2014, | $506.40; |
| September 29, 2014, | $506.40; |
| October 28, 2014, | $506.40; |
| November 26, 2014, | $506.40; and |
| December 27, 2014, | $506.40. |

The pharmacy submitted claims to Aetna on behalf of Fisher for payment.

25.     As of on or about July 31, 2014, Fisher had paid $5,000 in out-of-pocket expenses for Covered Services from Aetna's in-network providers.  As of December 31, 2014, Fisher had paid more than $8,000 in out-of-pocket expenses for Covered Services.

26.     For the purchases of EFFEXOR XR® described in paragraph 24, Aetna has refused to provide any co-insurance, even after Fisher's out-of-pocket expenses for Covered Services exceeded the annual, out-of-pocket maximum of $5,000.

27.     By e-mail sent September 8, 2014, Fisher appealed the decision of Aetna with respect to EFFEXOR XR®.  The e-mail of Dunnegan, on behalf of Fisher, provided:

"Dear Mr. Kilgallin,

Please accept this as an appeal of Aetna's refusal to pay any amount of the EFFEXOR XR for Jacqueline Fisher after the deductible was met.

1.     The contract between Aetna and Dunnegan & Scileppi was formed when we returned the document entitled "Final Rates" on January 9, 2014.  The language that you quote below did not come into existence until at least February 18, 2014, when Aetna's CEO sent us a letter purporting to change the contract that we had entered into on January 9, 2014.   Accordingly, Aetna cannot rely upon this language in interpreting the health insurance contract.  Without that language, Aetna has no colorable basis not to pay the subject claims.

*          *          *

3.     If the language you quote below is part of the contract, it means that Ms. Fisher pays the difference between the cost of the generic and the cost of the brand:

        (i)    with [up] to the 50 percent co-insurance from Aetna set forth in the schedule,

        (ii)   up to a maximum per year of $750 for a given drug (with Aetna to pay the excess), as set forth in the schedule, and

        (iii)  up to the maximum annual out-of-pocket cost (including the deductible and copayments) set forth in the schedule.

*          *          *

Tomorrow, to make sure that we have exhausted our administrative remedies, I will at a minimum send a copy of this e-mail by postal mail to the address set forth below."

28.     By letter dated October 8, 2014, Aetna denied the appeal, stating in

applicable part:

> "How we made our decision
>
> William Dunnegan requested additional reimbursement for the EFFEXOR XR
> prescription on your behalf.
>
> Based on a review of your claims, the expense applied to the deductible and
> copayment plus the difference in the brand and generic cost.
>
> Under the terms of your pharmacy benefit plan, choose generic requirement
> applies. When the doctor or member requests the brand name medication to be
> dispensed and a generic is available, you are required to pay the applicable plan
> copay, plus the difference in the brand and generic cost.
>
> Within the Three Tier/Essential Drug list for Small Group for New York,
> EFFEXOR XR 150mg is a 3-Tier Non-Preferred brand prescription with Step-
> Therapy.
>
> Step-therapy means you must try one or more qualifying medications before the
> requested medication can be covered.
>
> A qualifying medication is the generic venlafaxine xr 150mg.
>
> Another option besides Step-Therapy:
> If it is medically necessary for you to use a medication on the Step-Therapy list,
> your doctor can request an exception for coverage only, not copayment, at 855-
> 240-0535.
>
> EFFEXOR XR 150mg was approved [for Fisher] for coverage of the brand
> medication  from January 30, 2014 to January 30, 2015.
>
> The copay for the EFFEXOR XR 150mg (RX 0473847) filled on June 30, 2014,
> July 31, 2014 and August 27, 2014, did not apply toward the deductible but
> against copay plus the difference in the brand and generic.
>
> The copay for the EFFEXOR XR 150mg (RX 0473847) filled June 30, 2014, July
> 31, 2014 and August 27, 2014 was $35.68 and the copay plus the difference in the
> brand and generic cost is $470.72 for a total copayment to you of $506.40 for
> each date.
>
> The Health Exchange plan is ineligible for a Brand Penalty exception for a copay
> reduction when copay plus the difference applies. Therefore, no additional
> reimbursement will be issued."

29.     In its decision, Aetna never addressed Fisher's point that (a) the Unilateral Alteration was not part the insurance contract; (b) if it were part of the contract, then (i) Aetna had failed to pay any coinsurance for the EFFEXOR XR®; and (b) Aetna had failed to pay 100 percent of the cost of the EFFEXOR XR® after Fisher had met her annual out-of-pocket maximum. This exhausted Fisher's pre-litigation remedies, as any further appeals within Aetna would have proven futile.

A FIRST CAUSE OF ACTION
(Damages for Breach of the Contract)

30.     Fisher repeats the allegations in paragraphs 1 to 29.

31.     The Contract between Aetna and D&S is enforceable. Fisher is a third-party beneficiary of the Contract.

32.     The Contract results from an employee welfare benefit plan within the meaning of 29 U.S.C. §1002(1).

33.     D&S performed all of its obligations to Aetna under the Contract.

34.     Aetna has breached its obligations under the Contract in at least the following ways.

(a)     After Fisher met her individual deductible, and before she met her individual out-of-pocket maximum, Aetna refused to provide 50% co-insurance for EFFEXOR XR® up to $750.

(b)     After Fisher met her individual out-of-pocket maximum for Covered Services provided by Aetna's in-network providers, Aetna refused to pay 100% of Fisher's further costs for EFFEXOR XR®.

9

35.     Fisher suffered damages as a result of Aetna's breach of the Contract, in an amount to be determined by the trier of fact in this action.

A SECOND CAUSE OF ACTION
(Damages for Breach of the Unilateral Alteration)

36.     Fisher repeats the allegations in paragraphs 1 to 35.

37.     Alternatively, if the Unilateral Alteration contains enforceable terms of the contract between Aetna and D&S, then Fisher is a third-party beneficiary of any such contract.

38.     D&S performed all of its obligations to Aetna under any contract that includes the Unilateral Alteration.

39.     Aetna breached any contract that includes the Unilateral Alteration, in at least the following ways.

(a)     After Fisher met her individual deductible, and before she met her individual out-of-pocket maximum, Aetna refused to provide any co-insurance for the difference between the $10 co-insurance for the generic equivalent of EFFEXOR XR® and the actual cost of the EFFEXOR XR®.

(b)     After Fisher met her annual out-of-pocket maximum, Aetna refused to pay 100% of Fisher's further costs for EFFEXOR XR®.

40.     Fisher has suffered damages as a result of the breach of any contract that includes the Unilateral Alteration in an amount to be determined by the trier of fact in this action.

Class Action Allegations

41.     Fisher is bringing this action as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of herself and a class of persons similarly situated.

42.     The class is defined herein as natural persons who:

(a)     were beneficiaries, including third-party beneficiaries, during 2014, of an employee welfare benefit plan administered in New York  in which Aetna provided a health insurance contract (i) designated as "NY Silver OAMC 2000 80/60 HSA PY," or (ii) a substantially similar contract with respect to its prescription drug benefits; and

(b)     were denied insurance or co-insurance for a prescription drug that Aetna has characterized as a "non-preferred brand name drug," for which Aetna asserted that a generic equivalent drug exists, after the beneficiary's deductible had been met.

43.     The class is sufficiently numerous that joinder of all members is impracticable. The precise number of people in the class is known, or knowable to Aetna, and unknown and unknowable, to plaintiff at this time.  Upon information and belief, the number of people in the class exceeds 1,000.  The basis for this belief is as follows.

(a)     In 2014, the population of the United States was approximately 320 million people and the population of  New York State was approximately 19.7 million people.  New York State therefore had about 6.2 percent of the national population.  Under the Affordable Care Act, virtually all of those people were required in 2014 to have health insurance coverage.

(b)     In 2014, Aetna insured approximately 13.6 million people in the United States.  Aetna therefore had a national market share of approximately 4.5 percent.  Applying Aetna's national market

share to the approximately 19.7 million people in New York State, Aetna provided group health insurance coverage to approximately 886,500 people in New York State.

(c)    The domestic annual sales of EFFEXOR XR® approximate $4.5 billion.  EFFEXOR XR® costs an individual, before insurance, approximately $6,000 per year.  Thus, at the present time, approximately 750,000 people in the United States take EFFEXOR XR®.  If the United States had approximately 320 million people, then about one quarter of one percent of them take EFFEXOR XR®.  If that same percentage applies to the approximately 886,500 persons in the State of New York to whom Aetna provides insurance coverage, then Aetna would provide insurance to approximately 2,200 people in the State of New York who take EFFEXOR XR®.

(d)    If only 50 percent of those 2,200 people were covered by the same plan, or a substantially similar plan with respect to prescription drug coverage, as plaintiff, then the potential class of people plaintiff  proposes to include in the present action is more than 1,000.

(e)    EFFEXOR XR® is only one of many brand name prescription drugs for which Aetna has effectively used the Unilateral Alteration to avoid providing co-insurance.

Upon information and belief, members of the proposed class do not have the financial knowledge, ability and/or incentive to independently assert their claim.

      44.    There are questions of law and fact common to people in the class.  These include the following questions, among others.

    (a)    Did the document entitled "Final Rates," or a substantially similar document, represent the contract between Aetna and the relevant employer?   If so:

     (i)    Did the Contract, or a substantially similar document, require Aetna to pay 50% of the cost of the "non-preferred brand name drug" up to $750?

    (ii)    After the beneficiary has paid the annual maximum out-of-pocket amount, did the Contract require Aetna to pay for 100% of the cost of the "non-preferred brand name drug"?

    (b)    Did the Unilateral Alteration, or any substantially similar document, represent any part of the contract between Aetna and the relevant employer?

    (c)    If it did, after the beneficiary's deductible was met:

     (i)    Did the Unilateral Alteration, or any substantially similar document, require Aetna to pay any portion of the cost of the "non-preferred brand name drug"?

    (ii)    Did the Unilateral Alteration require Aetna to pay for 100% of the cost of the "non-preferred brand name drug" after the

beneficiary's annual out-of-pocket maximum had been met?

45.     The claims of Fisher are typical of the claims of the people in the class. Fisher has a common interest with each member of the class.

46.     Fisher will fairly and adequately protect the interests of the class.  The interests of Fisher are representative and coincident with, and not antagonistic to, those of the remainder of the class.  Fisher is represented by competent counsel.

47.      In addition, the prosecution of separate actions by individual members of the class would create a risk of:

        (a)     inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Aetna; and

        (b)     adjudications with respect to individual members of the class that would, as a practical matter, be dispositive of the interest of the other members not parties to the adjudications.

48.     The questions of law and fact common to the class members predominate over any questions affecting only individual members, and a class action would be superior to other available methods for fairly and efficiently adjudicating the controversy.  The individual class members have demonstrated no interest in prosecuting individual actions.  Upon information and belief, no such actions have been brought.  The difficulties of managing the litigation should be minimal. Upon information and belief, Aetna should be able to identify the class members from documents under its control.

WHEREFORE, Fisher, individually and on behalf of those similarly situated, demands judgment against Aetna:

(i)    Awarding judgment for compensatory damages in an amount to be determined by the trier of fact in this action;

(ii)    Granting Fisher the costs, including attorneys' fees in this action pursuant to 29 U.S.C. § 1132(g) or otherwise; and

(iii)    Granting such other and further relief as to the Court seems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the Constitution of the United States, Fisher hereby demands a trial by jury of all issues that are so triable.

Dated:  New York, New York
        January 14, 2015

DUNNEGAN & SCILEPPI LLC

By _William Dunnegan_
     William Dunnegan (WD9316)
     wd@dunnegan.com
     Laura Scileppi (LS0114)
     ls@dunnegan.com
     Richard Weiss (RW4039)
     rw@dunnegan.com
Attorneys for Plaintiff
350 Fifth Avenue
New York, New York 10118
(212) 332-8300