UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

JACQUELINE FISHER,                                    :
                                                      :
                                    Plaintiff,        :
                                                      :
      -v -                                            :
                                                      :
AETNA LIFE INSURANCE COMPANY,                         :
                                                      :
                                    Defendant.        :
---------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/29/2020

1:15-cv-283-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

   William Dunnegan, husband of Plaintiff Jacqueline Fisher, is a named partner at Dunnegan

& Scileppi LLC ("D&S").  When Dunnegan learned that his health insurance provider planned to

increase his premium by over thirty percent, he decided to shop for alternatives.  Dunnegan, assisted

by an independent broker named Fred Warner, selected a new plan offered by Defendant Aetna Life

Insurance Company ("Aetna").  On January 9, 2014, Aetna sent Dunnegan a document entitled

"Final Rates" (the "Final Rates document") that laid out some basic information about the plan

Dunnegan had chosen, including information about how Aetna would reimburse for generic and

brand-name drugs.  Dunnegan signed this document on behalf of D&S and returned it to Aetna.

   Fisher's doctor prescribed her a brand-name medication called Effexor XR that has a generic

equivalent.  D&S's insurance policy required Fisher to try the generic version of Effexor XR before

Aetna would reimburse for the brand-name version unless Fisher's doctor certified that the brand-

name drug was medically necessary—which he did not do.  Fisher filled her prescriptions for brand-

name Effexor XR for every month of 2014.

   On February 19, 2014, Dunnegan received his entire insurance contract from Aetna.  New

York state regulators approved the policy language in October 2013, and that language did not

change after the insurance policy received final approval.  But this was the first time that Dunnegan

saw all the terms of his insurance policy, including the provision that required Fisher to try a generic

medication before Aetna would reimburse for its brand-name equivalent.  Still, Dunnegan did not voice any objection to the policy before August 2014.  At that time, Dunnegan lodged an internal complaint with Aetna.  Among other arguments, Dunnegan argued that the Final Rates document did not include the requirement that a plan participant try the generic version of a drug before Aetna would reimburse her.  Aetna responded that D&S was bound by terms of the full insurance policy, not only those terms in the Final Rates document.

Because Dunnegan was on inquiry notice of the terms of the entire insurance contract when he executed the Final Rates document on behalf of D&S, those terms bound Fisher.  Thus, the Court grants judgment to Aetna on Fisher's claim for breach of the Final Rates document.  And because Aetna reasonably interpreted the insurance policy, the Court denies summary judgment on Fisher's claim for breach of the policy.  The Court held a bench trial to establish the terms of the parties' contract.  Having considered the parties' pretrial and post-trial submissions and the evidence presented at trial, the Court makes the following findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

### A. D&S and the Oxford Health Insurance Policy

Fisher resides in the State of New Jersey.  Joint Stipulation under FRCP 52(a)(1), Dkt. No. 63 ("JS"), ¶ 3.  She is married to William Dunnegan, a senior partner of the New York City-based law firm Dunnegan & Scileppi LLC ("D&S").  *Id.* ¶ 5.  Fisher's medical doctor diagnosed her with severe recurrent major depression, for which he prescribed her the brand name prescription drug Effexor XR.  *Id.* ¶ 9; Joint Exhibit ("JX") 30, Dkt No. 76.

D&S offers health insurance coverage to its employees—such as Dunnegan—and their beneficiaries—such as Fisher—through a small business group health insurance policy.  JS ¶ 6. D&S relied on the services of an independent insurance broker named Fred Warner to choose a group health insurance policy.  *Id.* ¶ 7; Transcript of Testimony of William Dunnegan ("Dunnegan

Tr."), Dkt No. 97, at 452:17-453:19.  Throughout 2013, D&S procured health insurance through a policy from Oxford Health, which D&S obtained with Warner's assistance.  JS ¶ 7; JX 1.  Oxford Health mailed the Group Enrollment Agreement containing the complete terms and limitations of the policy—totaling about 145 pages—to D&S on January 27, 2013, for coverage effective January 1, 2013.  JS ¶ 8; JX 1.

On November 11, 2013, Warner advised D&S that the Oxford Health plan was up for renewal.  JS ¶ 11; JX 3.  Because Oxford Health projected that the deductible would increase by thirty-two percent in 2014, Warner began to research alternatives.  JS ¶ 11; JX 3.  As senior partner of D&S, Dunnegan took a leading role in working with Warner to pick a new health insurance plan.  Dunnegan Tr. at 443:8-11.  In his discussions with Warner about procuring a new plan, Dunnegan emphasized three requirements:  That a new plan include out-of-network benefits, provide coverage in both New York and New Jersey, and allow a Health Savings Account.  JS ¶ 14; Dunnegan Tr. at 457:21-25.  Dunnegan did not raise the prescription drug benefit as a specific priority.  JS ¶ 14; Dunnegan Tr. at 458:18-459:5.

**B. The Health Connect Chart**

Warner used an online resource known as Health Connect to review the group health insurance plans available for 2014 from different insurance carriers.  JS ¶ 38; Transcript of Testimony of Fred Warner ("Warner Tr."), Dkt No. 93, at 21:7-24.  Warner testified that Health Connect provided information about Aetna's prescription drug benefit, so this information was available to him while he advised D&S about its health insurance options.  Warner Tr. at 23:23-24:8.  After reviewing plans, Warner advised D&S in an email dated November 25, 2013 that only two policies offered the combination of benefits D&S sought—its current Oxford Health Plan and a competing plan from Aetna.  JS ¶ 12; JX 4.

Warner attached to his email a summary chart prepared using Health Connect that showed the high-level rate and benefit information of eight different 2014 group health plans—five from

Aetna, two from Oxford, and one from Emblem Health.  Warner Tr. at 22:14-23:4; JX 4.  The

Court has reproduced the column of the chart including the summary terms of the plan D&S

ultimately bought from Aetna below.

| | Aetna Silver OAMC 2000 90/60 HSA PY ID: 14018895 (HSA) | |
|---|---|---|
| | In-Network | Out-Network |
| Rx Card | 10/50/50%to$750/TC5 IntDed | UCR=N/A |
| Individual/Family Deductible | $2,000/$4,000 non-embedded | $4,000/$8,000 non-embedded |
| Individual/Family OOP Limit | $5,000/$10,000 (incl ded) | $10,000/$20,000 (incl ded) |
| Co-Insurance | 20% | 40% |
| Lifetime Maximum | None | None |
| Primary Care | 20% after ded | 40% after ded |
| Specialist | 20% after ded | 40% after ded |
| Chiropractic Care | 20% after ded | 40% after ded |
| Inpatient Hospital | 20% after ded | 40% after ded |
| Inpatient Surgery | Refer to Inpatient Hospital | Refer to Inpatient Hospital |
| Mental Health Inpatient | 20% after ded | 40% after ded |
| Substance Abuse Inpatient | Detox: 20% after ded Rehab: 20% after ded | Detox: 40% after ded Rehab: 40% after ded |
| Outpatient Facility | Refer to Outpatient Surgery | Refer to Outpatient Surgery |
| Outpatient Surgery | 20% after ded | 40% after ded |
| Lab/X-Ray | 20% after ded | 40% after ded |
| Mental Health Outpatient | 20% after ded | 40% after ded |
| Substance Abuse Outpatient | Detox: 20% after ded Rehab: 20% after ded | Detox: 40% after ded Rehab: 40% after ded |
| Emergency Room | 20% after ded | Paid as in-network |
| Home Health Care | 25% after ded; 40 visits/plan yr comb in/out | 25% after ded; 40 visits/plan yr comb in/out |
| Single | 4 x | $473.19 |
| EE with Spouse | 0 x | $945.38 |
| EE with Child(ren) | 0 x | $804.43 |
| Family | 1 x | $1,348.80 |
| Medicare | 0 | $0.00 |
| Monthly Cost | 5 | $3,241.36 |
| Annual Cost | | $38,895.32 |

As shown above, on the "Rx Card" line and in the "In Network" column, the Health Connect chart contained the phrase "10/50/50% to $750/TCS IntDed."  Warner testified that it was standard practice in the health insurance industry to present information about a health insurance plan's prescription drug benefit in this fashion.  Warner Tr. at 42:25-43:20.  Warner also testified that he understood this phrase to mean that a plan participant would pay $10 to fill a generic prescription, $50 to fill a brand-name prescription listed on Aetna's "formulary,"[1] and 50 percent of the cost of a prescription not listed on Aetna's formulary up to $750 for a thirty-day supply.  *Id.*  Dunnegan testified that he was not sure what "TCS" or "IntDed" meant.  Dunnegan Tr. at 465:11-21, 490:10-25.  He also testified that he assumed "Ded" meant deductible and the remaining information conveyed to him that the copay for Tier 1 drugs was $10, the copay for Tier 2 drugs was $50, and the copay for Tier 3 drugs was 50% up to $750 after the deductible.  *Id.*  The Health Connect chart also included lines summarizing "[m]ental health inpatient" and "[s]ubstance abuse inpatient."  JX ¶ 4.  Karen Pribush, a retired Aetna sales manager, testified that she believed that summary charts prepared with Health Connect were prepared to give putative customers a high-level summary of the benefits about which these potential customers tended to be most interested, rather than fully disclosing every plan benefit.  Transcript of Testimony of Karen Pribush ("Pribush Tr."), Dkt No. 95, at 232:12-22.

Health Connect includes a function enabling a user to generate a "FootNote Report" that includes more information.  Health Connect users must check a box when creating a summary chart to generate the FootNote Report.  Warner Tr. at 29:20-31:15; Pribush Tr. at 387:10-390:15.  When D&S was shopping for health insurance for 2014, the FootNote Report provided a link to the Summary Benefit Comparison ("SBC") for Aetna plans.[2]  Pribush Tr. 389:18-390:3; JX 23.  But the

---

[1] The formulary, which divides drugs covered by Aetna into tiers, is discussed below.
[2] The SBC is also discussed below.

Health Connect-generated summary chart Warner emailed to Dunnegan lacked the FootNote report.  JX 4.

After receiving this summary chart showing high-level comparison information about the various plans available, D&S conducted its own analysis based on the information in the chart.  JS ¶ 15; JX 4; Dunnegan Tr. at 552:22-557:6.  Dunnegan testified that he understood the Health Connect chart to contain basic information and that it did not necessarily describe all the terms of a plan. Dunnegan Tr. at 470:10-471:11.  He also testified that he understood that all the terms for the plans would be set forth elsewhere in a contract or some other government-approved document.  *Id.* at 481:3-482:4.  Dunnegan also testified that he was familiar with the notion that insurance companies categorized prescription drugs into different benefit tiers, and that he knew insurance companies published lists of drugs showing which specific medications fell into each tier.  *Id.* at 465:12-466:17.

### C. Other Summary Documents Prepared by Aetna

Aetna also prepared other summary documents that contained more information about their health insurance plans.  One such document was a Summary of Benefits and Coverage ("SBC").  JS ¶ 33; JX 14.  The SBC is "a concise document detailing, in plain language, simple and consistent information about health plan benefits and coverage."  JS ¶ 32.  Federal law regulates both the form and content of SBCs.  *Id.*  While he advised D&S in November and December 2013 about its insurance options for 2014, Warner had access to the SBC through multiple sources.  *Id.* ¶ 38. These included:  (1) an SBC Search Tool, available through a site specifically designed for brokers called Producer World, *id.* ¶ 38(a); JX 17; (2) Health Connect, JS ¶ 38(e); JX 23; (3) a "1-888" number that brokers could call to obtain the SBC, JS ¶ 38(f), and (4) a "1-800" number though which a broker or a member of the public could obtain an SBC.  JS ¶ 38(g).  Aetna publicized the SBC Search Tool through announcements on Producer World on November 1 and December 13, 2013.  JS ¶ 38(b); JXs 18-19.  And the SBC Search Tool was available to the public on Aetna's website.  JS ¶ 38(d); JX 22.  While Warner testified that he could not retrieve the SBC in 2014, the

Court does not fully credit that testimony.[3]  Warner Tr. at 53:5-13.  The parties stipulated that the SBC was available through multiple sources.  JS ¶ 38.  Thus, the Court finds that the SBCs for Aetna's 2014 plans were available to Warner while he advised Dunnegan about its health insurance options for 2014.

Aetna also prepared a prescription drug formulary (the "Formulary"), also known as the Aetna Preferred Drug Guide.  JS ¶ 36; JX 15.  Formularies provide information about the general terms of their prescription drug coverage and the restrictions applicable to specific medications.  JS ¶ 35.  Insurance carriers are required by state regulations to develop and publish formularies sixty to ninety days before the upcoming calendar year.  *Id.*  While Warner was advising D&S about its insurance options for 2014, he also had access to the Formulary through various sources.  *Id.* ¶ 39.  These included:  (1) a Formulary search tool available through Producer World, *id.* ¶ 39(a); JX 24; (2) a Formulary search tool on Aetna's public website, JS ¶ 39(b); JX 24; (3) a "1-888" number for brokers, JS ¶ 39(c); (4) and a "1-800" number for brokers or members of the public.  *Id.* ¶ 39(d).

The Aetna Formulary divides prescription medications into different "therapeutic classes." *Id.* ¶ 67.  Drugs within the same therapeutic class treat the same medical condition.  *Id.*  In each therapeutic class, the Formulary designates "preferred drugs."  *Id.*  Aetna uses a program known as "Step Therapy" to promote the appropriate use of preferred drugs.  *Id.* ¶ 68.  The Step Therapy requirement is designed to control health care costs.  If a generic equivalent of a brand-name medication exists, patients subject to Step Therapy must generally try the generic version of a drug, assuming there is such a generic version of the drug, before Aetna will cover the brand-name equivalent.  The Aetna Formulary generally prefers generic drugs to brand drugs because generics are medically equivalent and cost less than brand-name drugs.  *Id.* ¶ 70.

---

[3] As D&S's broker, Warner had an incentive to align his testimony with Fisher's position in this litigation.  It is also relevant that some of Warner's actions, such as decision not to generate the FootNote Report to the Health Connect chart, reflect poorly on his performance as a broker.  Warner thus had an incentive to cast blame on Aetna so that the blame did not come to rest on him.

An Aetna member can ask Aetna to waive the Step Therapy requirement.  To do so, the member or the member's doctor must certify that the brand-name drug is medically necessary.  *Id.* ¶ 69.  If Aetna agrees that the brand-name drug is medically necessary, it will grant the waiver.  *Id.* The member can then fill a prescription with a non-preferred brand-name drug, even if there is a lower-cost generic alternative.  *Id.* ¶ 68.

Neither Aetna nor Warner provided D&S with a physical copy of the SBC or the Formulary. JS ¶ 40.  Nor did Aetna direct D&S to a specific internet address on which either of these documents could be found until at least September 15, 2016.  *Id.*

Aetna also published product brochures, which were both publicly available on Aetna's website and available to D&S's broker Mr. Warner through Producer World.  JS ¶ 38(c); JXs 20, 21; Pribush Tr. at 234:12-237:9, 281:6-11.  The brochures explained the SBC and provided another high-level summary of plan benefits.  JXs 20, 21.

Warner testified that he could have checked whether an insurance plan covered a prescription drug in multiple ways.  Warner Tr. at 40:5-14.  He testified that he could go to a plan's website and try to find the plan's formulary to see if it covered a drug and whether there were any approved generics.  *Id.*  Warner also testified that an Aetna representative told him that members could go the Aetna website to find if a specific Aetna plan covered a drug.  *Id.* at 37:12-20.  While Warner testified that he was unable to obtain a printout of the Formulary, the Court again declines to credit that testimony.  *Id.*  The parties have stipulated that the Formulary was available through a search tool on Aetna's public website, which Warner could have used to print the Formulary.  JS ¶ 38(b).  And Warner could have called Aetna to ask for a printout of the Formulary.  Id. ¶¶ 38(c)-(d).  The Court thus finds that Warner could have obtained a printout of the Formulary from the Aetna website when he was advising Dunnegan on his health insurance plan for 2014.

8

### D. The 2014 Aetna NY Silver Plan

D&S selected the small business group plan known as the Aetna New York "Silver OAMC 2000 80/60 HSA PY" (the "2014 Aetna NY Silver Plan"). JS ¶ 17.[4]  As noted above, the Health Connect chart stated that the 2014 Aetna NY Plan selected by D&S provided an in-network pharmacy benefit of "10/50/50% to $750/TCS IntDed." *Id.* ¶ 18; JX 4.

New York insurance regulators approved the terms of the 2014 Aetna NY Silver Plan before D&S began shopping for a health insurance plan for 2014.  The Department of Financial Services ("DFS") regulates small business group health insurance plans in New York.  JS ¶ 50.  Aetna was therefore required to submit all its New York small business policies for policy year 2014 for DFS review and approval.  *Id.*  DFS gave final approval to the language of the 2014 Aetna NY Silver Plan on October 21, 2013.  *Id.* ¶ 60.  Aetna could not lawfully change the terms of the 2014 Aetna NY Silver Plan after DFS approved it without seeking DFS approval.

### E. D&S's Application

On December 18, 2013, D&S and each of its six employees sent completed applications for the 2014 Aetna NY Silver Plan to Mr. Warner.  JS ¶ 19; JX 5.  The application that Mr. Dunnegan executed on behalf of D&S contained, among others, the following provisions above the signature block where Mr. Dunnegan signed:

> The plan documents, including the policy and certificate, will determine the contractual provisions, including procedures, exclusions, and limitations relating to the plan and will govern in the event they conflict with any benefits comparison, summary or other description of the plan.
>
> * * *
>
> I understand that this application will form a part of the Group Agreement or Group Policy issued by Aetna, and by my signature below I agree to be bound by the terms and conditions of that Group Agreement or Group Policy.

---

[4] Insurance policies are divided into metallic tiers, including platinum, gold, silver, and bronze.  Pribush Tr. at 272:1:19. Plans in different metallic tiers offered the same benefits but have different cost-sharing requirements.  *Id.*  For example, a platinum plan offers the same services as a bronze plan but likely would have a lower deductible.  *Id.*

JX 5.  D&S did not have any direct contact with Aetna before it submitted these applications.  JS ¶ 20.

Also on December 18, Warner orally requested that D&S sign a document summarizing certain rates and benefits, and D&S promptly did so.  *Id.* ¶¶ 21-22; JX 7.  Warner testified that he knew this application was not a complete statement of the terms and limitations of the 2014 Aetna NY Silver Plan because it did not state the policy's limitations.  Warner Tr. at 74:22-25.  Rather, Warner testified that he communicated that the document included the "major benefits of the plan" along with the "deductibles, the coinsurances and the premiums."  *Id.* at 75:14-76:1.  Warner also testified that he found a brochure on Aetna's website form 2012 with more detailed information, which he shared with D&S.  *Id.* at 84:6-20.  But Warner testified that one would "always have to go back to the contract"—rather than a summary of benefits obtained through Health Connect or in a brochure—to obtain detailed information about the terms and limitations of the contract.  *Id.* at 87:6-12; 88:10-18.  Warner testified that it is a typical practice in the insurance industry for an insurance company to provide insurance and then to provide a contract listing all the terms and limitations at some later point.  *Id.* at 89:19-24.

On December 23, 2013, D&S sent Warner further information that Aetna required to process D&S's application.  JS ¶ 23; JX 8.  Warner then sent the D&S application to Aetna's underwriting department.  JS ¶ 24.  On January 8, 2014, Aetna sent Warner an email to inform him that Aetna had approved the D&S application, effective January 1, 2014.  *Id.* ¶ 25.  Warner forwarded this email to D&S the next day.  *Id.* ¶ 26.

### F. The Final Rates Document

The same day, Aetna sent D&S a document entitled "Final Rates."  *Id.* ¶ 27; JX 11-12.  The Court has reproduced the first and third pages of the executed version of the Final Rates document below.



**Final Rates**

Group Name: DUNNEGAN & SCILEPPI LLC
Effective Date: 01/01/14 to 01/01/15
CFO: 138
SIC Code: 8111

Broker Name(s):   FRED WARNER

DUNNEGAN & SCILEPPI LLC has been approved effective [Quote.ProposedEffectiveDate4DigitYr]. Attached please find the final rate quote. Aetna reserves the right to adjust rates if there is more than a 20% change in enrollment/demographics of the group at any time in the policy year. Please have the employer sign and date, and fax to Aetna Underwriting at [ProposalTypeCFO.FaxNumber]. If any individuals are (1) eligible for COBRA or State Continuation, (2) are still within their election period but have not enrolled, and (3) enroll in the future, this will constitute a change in census, and your company's health benefits plan may be charged a different premium for this coverage.

Rates may be pending regulatory review or approval and are subject to adjustment as needed. Final rates will be compliant with state law and distributed accordingly.

| "X" below for Requested Plan(s) | MEDICAL | Metallic Value | Plan ID | Bundled Plan ID | Premium | PLAN INFORMATION | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Plan Options | | | | TOTAL PREMIUM | Coins. | PCP/Spec | Deductible (Ind/Fam) | OOP Max | RX |
| | NY Silver OAMC 2000 60/60 HSA PY | S | 14018895 | 20018895 | $3,714.55 | In: 20% Out: 40% | In: 20% aft ded Out: 40% aft ded | In: $2,000/$4,000 PY Ded: $4,000/$8,000 PY | In: $5,000/$10,000 PY Out: $10,000/$20,000 PY | In: $10/ $50 / 50 % to $750 max aft ded Out: $10/40%/$50+ 30%/50% to $750 max aft ded |
| | | | | Assumed Lives | 8 | | | | | |

| Medical Network Key | | | |
|---|---|---|---|
| In: | In Network | Out: | Out of Network |

**PATIENT PROTECTION AND AFFORDABLE CARE ACT**
**Fees and Assessments**
The Patient Protection and Affordable Care Act imposes two new fees/assessments, the Transitional Reinsurance Contribution (R C) and the Health Insurer Fee (HIF) (collectively hereinafter the "Fees"). The Fees are effective as of January 1, 2014; however, rate quotes for a policy year starting in 2013 will include, where permitted and as applicable, the Fees assessed on the portion of premium that is paid in 2014. This rate quote includes, where permitted, an estimated proportionate allocation of up to 2.6% for HIF and up to 2.1% for RC.

QUOTE: 11258154                                    CONFIDENTIAL                                    Page 1 of 5

F000157Confidential

---



**Final Rates**

Group Name: DUNNEGAN & SCILEPPI LLC
Effective Date: 01/01/14 to 01/01/15
CFO: 138
SIC Code: 8111

Broker Name(s):   FRED WARNER

(www.mahealthconnector.org ). For non-Massachusetts contract holders that provide coverage to Massachusetts employees: This plan may not be considered as creditable coverage under the Massachusetts Health Care Reform Law and the employee may be subject to tax penalties.

This preliminary rate sheet should be read in conjunction with the more detailed benefit descriptions, exclusions and limitations, and underwriting guidelines contained in your product brochures. For more information, please contact your licensed agent or Sales Representative. "Aetna" is the brand name used for products and services provided by one or more of the Aetna group of subsidiary companies. These companies include Aetna Health Inc.; Aetna U.S. Healthcare Inc.; Aetna Health of California Inc.; Aetna Health of the Carolinas Inc.; Aetna Health of Illinois Inc.; Aetna Health of North Texas Inc.; Aetna Health of Washington Inc.; Aetna Life Insurance Company; Aetna Health Insurance Company of Connecticut; Aetna Health Insurance Company of New York; Aetna Health Insurance Company; Aetna Dental Inc.; and/or Aetna Dental of California Inc.

Your member documents will be revised on renewal to clarify that the member payment responsibility for pharmacy claims will be calculated using either the actual discounts and fees paid to participating pharmacies, or the amount paid by Aetna to a third party pharmacy benefits service provider. The amount paid to a participating pharmacy may be different than the amount paid to the third party pharmacy service provider.

**"Make available option"**
You are not required to raise the dependent limiting age to 30 under your plan of benefits. However, if you do accept this option, dependents would have to meet the eligibility criteria.
If you elect this option:
  •  The election would take effect upon inception of your plan
  •  Your premium rates will be affected
  •  You will need to report the dependent to us on your eligibility submission
If you wish to elect the 'make available option' which will continue coverage under your Aetna plan for a dependent child up to age 30, please request in writing and fax to 1-866-427-2689 or contact your broker and we will provide the adjusted rates.

Dependents not enrolled during your open enrollment period will be treated as late enrollees and will have to wait until your plan's next open enrollment period to enroll. There may be tax consequences to both you as the employer and your employee if you elect coverage for a dependent child up to age 30. It is recommended that employers consult a tax attorney regarding how to handle the imputed wages for any contribution they provide for dependents who are emancipated and no longer dependents for tax purposes of the eligible employee/enrollee. Employee  contributions for an emancipated dependent made on a pre-tax basis may also have tax implications  for the employee.

| | | |
|---|---|---|
| Employer Authorized Signature | Date 1/8/14 | E-Mail Address watd.dunnegan.com |
| Print / Type Name William Dunnegan | Title | Phone Number (212) 332-8300 |

QUOTE: 11258154                                    CONFIDENTIAL                                    Page 3 of 5

F000159Confidential

The Final Rates document is five pages in total.  JX 12.  It contains high-level information about the 2014 Aetna NY Silver Plan that D&S had selected, including the total monthly premium, the coinsurance levels, and the deductible.  The Final Rates document identifies the plan that D&S bought as the "NY Silver OAMC 2000 80/60 HSA PY" with the plan ID number 14018895.  In a column titled "RX," the Final Rates document states:  "In: $10/$50/50% to $750 max aft ded Out: $10+30%/$50+30%/50% to $750 max aft ded."  For in-network prescription drug benefits, the Final Rates document relayed the same information that was available on the Health Connect chart: A plan participant would pay $10 to fill a generic prescription, $50 to fill a brand-name prescription listed on Aetna's Formulary, and 50 percent of the cost of a drug not listed on the Formulary up to $750 for a thirty-day supply.  The Final Rates document discloses "[t]his preliminary rate sheet should be read in conjunction with the more detailed benefit descriptions, exclusions and limitations, and underwriting guidelines contained in your product brochures.  For more information, please contact your licensed Agent or Aetna Sales Representative."  JS ¶ 40; JX 11.

The Final Rates document had no other documents attached to it.  JS ¶ 31.  But Warner testified that the Final Rates document "obviously" did not have every term and condition associated with the 2014 Aetna NY Silver Plan.  Warner Tr. at 98:19-23.  Dunnegan testified that "when I originally got the [Final Rates document] handed to me by Emily on January 9th, my initial reaction was there's more to this; where's the rest of it?"  Dunnegan Tr. at 482:20-22.  The Final Rates document contained a line for an employer-authorized signature.  JX 11.

D&S executed a copy of the Final Rates document and sent it to Aetna by email on January 9, 2014.  JS ¶ 29; JX 12.  Both parties agree that by returning an executed version of the Final Rates document, D&S created an enforceable contract between itself and Aetna.  But the parties disagree as to the terms of that contract.  JS ¶ 30.  Fisher's current position is that the five-page Final Rates document contained all the terms of D&S's insurance policy.  In contrast, Pribush testified that

Aetna understood that it was agreeing to cover D&S under the 2014 Aetna NY Silver Plan as approved by New York insurance regulators.  Pribush Tr. at 270:2-6.

The Court finds that it is not credible that Dunnegan believed that the Final Rates document constituted his entire Aetna insurance policy.  To begin, Dunnegan's testimony that "there's more to this" when he received the Final Rates document amounts to an admission that Dunnegan himself did not believe that the Final Rates document included all the policy's material terms.  And, as noted above, the Final Rates document includes a disclaimer alerting the reader that it is not to be read in isolation.  The Final Rates document is also more detailed in some respects than the summary chart Warner downloaded from Health Connect and provided to Dunnegan.  For example, the Health Connect chart includes lines for "[m]ental health inpatient" and "[s]ubstance abuse inpatient."  The Final Rates document includes neither of these terms.  Finally, D&S's prior policy from Oxford Health was about 145 pages long.  For these reasons, it is not credible that Dunnegan—who is trained as a lawyer—believed that the Final Rates document constituted D&S's entire insurance policy with Aetna.

Dunnegan's position on the Final Rates document evolved in accord with his, his wife's, and his firm's, economic incentives.  At first, Dunnegan recognized that it was unlikely—if not impossible—that the Final Rates document contained all the terms of D&S's contract with Aetna.  And as described further below, Dunnegan chose not to take the modest steps necessary to seek reimbursement for his wife's brand-name medication from Aetna.  Those decisions coincided with Dunnegan's decision to bring this putative class-action litigation, in which Fisher could have acted as Lead Plaintiff and D&S could have served as class counsel.  Dunnegan's evolving position—and his incentives to generate grist for a class-action complaint—further undermines his credibility.

The Final Rates document stated that D&S's health insurance coverage with Aetna was retroactive to January 1, 2014.  JS ¶ 43.  On January 17, 2014, Aetna emailed D&S, stating that Aetna had enrolled D&S attorneys and staff and their families in the insurance program by issuing

member identification cards.  *Id.* ¶ 45; JX 26.  After DFS approved the entire Aetna portfolio of

small business group plans, Aetna prepared the policies for publication in February 2014.  JS ¶ 63.

### G. The Group Policy

On February 19, 2014, Aetna mailed a form letter under the signature of Mark T. Bertolini,

Chairman and Chief Executive Officer of Aetna.  JS ¶ 48.  This letter enclosed a document

purporting to be a group insurance policy (the "Group Policy").  *Id.*; JX 27.  The Group Policy did

not deviate from the model language approved by DFS.  The Group Policy includes the following

DFS model language for 2014:

> An additional charge may apply when a Prescription Drug on a higher tier is dispensed
> at Your or Your Provider's request, when a chemically equivalent Prescription Drug
> is available on a lower tier unless We approve coverage at the higher tier.  You will
> have to pay the difference between the cost of the Prescription Drug on the higher
> tier and the cost of the Prescription Drug on the lower tier.  The cost difference must
> be paid in addition to the lower tier Copayment or Coinsurance.

JS ¶ 55; JX 27 at 27.  This is known as a "Choose Generic" provision.  JS ¶ 55.

Under the Choose Generic provision, a member must first try the generic version of a

medication before Aetna will approve the brand-name equivalent.  *Id.* ¶ 71.  If the member chooses

the brand-name drug absent a waiver of the Choose Generic requirement, the member must pay an

additional charge equal to the difference between the cost of the brand and the generic.  *Id.*  The

member can request a waiver of the Choose Generic requirement, but Aetna requires that the

member's doctor provide documentation to show that the substitution is medically necessary.  *Id.*

Before February 10, 2014, the draft of the Group Policy existed only in electronic form and

was not publicly available.  *Id.* ¶ 64.  But detailed information about the terms, conditions,

limitations, and exclusions of all of Aetna's small business plans—including the 2014 Aetna NY

Silver Plan—was available to Aetna sales, customer service, and claims processing representatives

beginning in November 2013.  *Id.* ¶ 65.  This included information about the policy's coverage of

prescription drugs.  *Id.*; JX 28.  These Aetna representatives could access this information to answer

questions about what the 2014 Aetna NY Silver Plan covered.  No one associated with D&S, including Dunnegan and Fisher, objected to the Group Policy until August 14, 2014.  JS ¶ 66; JX 29. And no D&S representative, including Dunnegan and Fisher, asked for a copy of the Group Policy, even though the Final Rates document alerted its readers that it was not to be read in isolation and provided contact information for Aetna representatives who could provide further information.

**H. Inquiry Notice**

The Court makes a factual finding that Dunnegan was on inquiry notice of the terms of the Group Policy after he received the Final Rates document.  "Where an offeree does not have *actual* notice of certain contract terms, he is nevertheless bound by such terms if he is on *inquiry* notice of them and assents to them through conduct that a reasonable person would understand to constitute assent."  *Starke v. Squaretrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019) (citation omitted).  "In determining whether an offeree is on inquiry notice of contract terms, New York courts look to whether the term was obvious and whether it was called to the offeree's attention."  *Id.* (citations omitted).  "While it may be the case that many users will not bother reading the additional terms, that is the choice the user makes; the user is still on inquiry notice."  *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 79 (2d Cir. 2017).  Whether a party is on inquiry notice is a question of fact.  *See Meyer v. Kalanick*, 203 F. Supp. 3d 393, 396 (S.D.N.Y. 2016) (noting that in *Nicosia v. Amazon*, 834 F.3d 220 (2d Cir. 2016), the Second Circuit held that "whether the plaintiff was on inquiry notice of contract terms . . . was a question of fact").

Dunnegan and D&S were on inquiry notice of the terms of the Group Policy.  Because New York insurance regulators approved the material terms of the 2014 Aetna NY Silver Plan in October 2013, those material terms existed when D&S applied for health insurance and when Dunnegan signed and returned the Final Rates document on January 9, 2014.  DFS gave its final approval to the terms of the 2014 Aetna NY Silver Plan on October 21, 2013.  JS ¶ 59.  The language of the Group Policy—including the Choose Generic provision—did not vary from the language approved

by New York state in October 2013. *Id.* ¶ 61. Pribush confirmed in her testimony that New York approved the terms of the New York Silver Aetna Plan. Pribush Tr. at 268:6-17. So, in accordance with New York's legal requirements, the material terms of the Plan existed after October 21, 2013.

As the Court noted above, it is not credible that Dunnegan believed the Final Rates document to be his entire insurance policy. The Final Rates document stated that D&S was purchasing an "NY Silver OAMC 2000 80/60 HSA PY" with plan ID 14018895. JX 12. The Final Rates document also stated that "[t]his preliminary rate sheet should be read in conjunction with the more detailed benefit descriptions, exclusions and limitations, and underwriting guidelines contained in your product brochures. For more information, please contact your licensed agent or Sales Representative." *Id.* Moreover, all of D&S's employees filled out applications in December 2013 that stated that "[t]he plan certificate of coverage will determine the rights and responsibilities of member(s). It will govern in the event they conflict with any benefits comparison, summary or other description of the plan." JX 5. And by signing the application, D&S employees affirmed that "I understand that this application will form a part of the Group Agreement or Group Policy issued by Aetna, and by my signature below I agree to be bound by the terms and conditions of that Group Agreement or Group Policy." *Id.*

Because it was clear that the Final Rates document did not constitute D&S's entire insurance policy, Dunnegan was on inquiry notice that he agreed to more terms by signing the Final Rates document. In other words, it was "obvious" that the 2014 Aetna NY Silver Plan that Dunnegan bought by executing the Final Rates document included additional terms. *Starke*, 913 F.3d at 289.

If Dunnegan or Warner[5] had inquired, either of them could have received the material terms of the 2014 Aetna NY Silver Plan from an Aetna representative. The Final Rates document

---

[5] "Both New York insurance law and common law provide that insurance brokers act as agents on behalf of the insured where they are employed by the insured to procure insurance." *Emtex Co. v. Hartley Cooper Assocs.*, 102 F.3d 1327, 1331-32 (2d Cir. 1996) (quotation omitted). Moreover, "[b]edrock principles of agency law provide that the knowledge of an agent, acquired while acting within the scope of employment, is imputed to his principal." *In re: Lyondell Chem. Co.*, No.

identified the plan that D&S was purchasing as "New York Silver OAMC 2000 80/60 HSA PY"
and listed the Plan ID number as 14018895.  JX 12.  The Final Rates document also notified
Dunnegan that he could contact an Aetna Sales Representative.  The details of the 2014 Aetna NY
Silver Plan—including all material terms—were available to Aetna sales, customer service, and
claims processing representatives as of November 2013.  JS ¶ 65.  That makes sense:  DFS approved
the entire policy in October 2013.  And Aetna representatives might have needed to access the
policy details to field requests from customers about what precisely the 2014 Aetna NY Silver Plan
covered.  Put simply, Dunnegan was on notice that he could have called Aetna to ask about the
terms of the 2014 Aetna NY Silver Plan if he had questions about its material terms.

Pribush's testimony bolsters this conclusion.  Pribush testified that Aetna's compliance
department had a copy of the insurance policy.  Pribush Tr. at 275:9-15.  Pribush also testified that
Aetna believed that it was bound by the terms of the 2014 Aetna NY Silver Plan when D&S
returned the Final Rates document; Pribush testified that "[e]ven though the contract itself, the
document, had not been produced for the client, the contract did exist and was in fact approved by
the state.  So even if we had not produced a hard copy or an electronic copy of the contract, we are
bound to administer the benefits as they're filed and as they're represented in the contract."  *Id.* at
274:9-14.  She also testified that she could have obtained a copy of the contract containing all
material if there were an "urgent need."  *Id.* at 270:22-23.  Thus, if Dunnegan or another D&S
employee had asked about the material terms of the 2014 Aetna NY Silver Plan before Dunnegan
signed the Final Rates document on January 9, 2014, an Aetna representative could have relayed

---

16-cv-518 (DLC), 2016 WL 5818591, at *3 (S.D.N.Y. Oct. 5, 2016) (citing Restatement (Third) of Agency § 5.03 and
Restatement (Second) of Agency § 272).  Thus, if Warner had accessed the material terms of the insurance policy, that
knowledge may have been imputed to Dunnegan.

those terms.[6]  For these reasons, the Court finds that D&S was on inquiry notice about the terms of the Plan when it received the Final Rates document in January 2014.

### I. Fisher's Prescription for Effexor XR

Fisher submitted a prescription for brand-name Effexor XR at her pharmacy on January 29, 2014.  JS ¶ 75.  The Aetna Formulary specifically addressed the drug with brand-name Effexor XR and its generic equivalent, venlafaxine.  *Id.*; JX 15.  The Aetna Formulary designated Effexor XR as a Tier 3 drug subject to the Choose Generic Provision.  JS ¶ 75.  In 2014, the cost of a 30-day supply of brand-name Effexor XR ranged from $348.82 to $506.40.  *Id.* ¶ 73.  The cost of a 30-day supply of venlafaxine was $35.68.  *Id.*

Aetna declined to cover Fisher's Effexor XR prescription.  *Id.* ¶ 75.  Later on January 29, Fisher's doctor, Dr. David Rosenfeld, submitted a form titled "Medical Exception/Prior Authorization/Precertification:  Request for Prescription Medications" that was a request for Aetna to cover Effexor XR.  JS ¶ 76; JX 30.  The request listed three brand-name drugs—Prozac, Pristiq, and Abilify—to which Fisher had demonstrated "inad[equate] responses."  JX 30.  But Dr. Rosenfeld's request did not mention that Fisher had tried venlafaxine.

Aetna approved Dr. Rosenfeld request on January 30, 2014.  JS ¶ 77; JX 31.  But Aetna did not intend to waive the additional charge applicable to the brand name prescription.   *See* JX 27 ("An additional charge may apply when a prescription drug on a higher tier is dispensed at you or your provider's request when a chemically equivalent prescription drug is available on a lower tier unless we approve coverage at the higher tier.").  By granting the request to cover Effexor XR, Aetna acknowledged that Effexor XR was "approved for coverage" but did not approve additional reimbursement for it.  JS ¶ 79.

---

[6] The Court notes that it has made a factual finding that an Aetna representative could have produced the material terms of the 2014 NY Silver Plan as early as November 2013.

Fisher bought Effexor XR at Franklyn's Pharmacy, a retail pharmacy within Aetna's network.  JS ¶ 80.  She paid between $348.82 and $506.40 every month over the course of 2014.  *Id.* ¶¶ 80, 83, 86.  The pharmacy submitted claims to Aetna on Fisher's behalf for those amounts.  *Id.* ¶ 81, 87.  Aetna created records showing that Dunnegan and Fisher had to pay these amounts—in other words, that Aetna would not pay any amount for these prescriptions—and posted them to a website accessible to Dunnegan and Fisher as Aetna members.  *Id.* ¶ 82; JX 32-33.  The maximum amount Fisher's family paid that could count toward the out-of-pocket limit is $8,951.14.  JS ¶ 88; JX 33.  Aetna has refused to provide any reimbursement for any of Fisher's purchases of Effexor XR in 2014.  JS ¶ 90.

### J. Fisher's Appeal Within Aetna

On August 14, 2014, Dunnegan contacted Aetna about its decisions concerning Effexor XR. JS ¶ 91.  Aetna replied the same day and attached two documents, one of which was the SBC.  JXs 34-35.  Warner also contacted Aetna around the same time.  JS ¶ 93.  Aetna informed Warner about the process to request a waiver of the brand-generic cost differential for Effexor XR.  *Id.*  Dunnegan emailed Fisher on August 15, 2014, stating:  "I spoke with the insurance broker, Fred Warner.  If Rosenfeld (or possibly someone from his office) calls (800) 414-2386 and explains that you need the brand name, then they should approve it and pay it retroactively.  For reference, the person who the broker spoke with had the employee code at Aetna: 1941564903."  *Id.* ¶ 93; JX 36.  On August 15, 2014, the office of Dr. Rosenfeld—Fisher's doctor—faxed Dunnegan a copy of Aetna's authorization of coverage (though not additional reimbursement) for Effexor XR.  JS ¶ 94; JX 31.

Aetna denied Fisher's claim by emails dated August 18 and 19, 2014.  JS ¶ 95; JX 29.  The August 18 email advised that Fisher could seek a medical-necessity waiver of the Choose Generic brand-generic cost differential.  JS ¶ 95.  This was the second time that Aetna informed Dunnegan about the possibility of seeking a medical-necessity waiver, but Dunnegan chose not to do so.  On August 19, 2014, Dunnegan sent a fax to Dr. Rosenfeld requesting that he call Aetna "and see if [he]

can make any progress with Aetna in paying for the Effexor[.]" JX 37.  However, on August 21, 2014, Dunnegan sent a second fax instructing Dr. Rosenfeld to "disregard" the August 19 fax because "[w]e have concluded that Aetna has no interest in making an honest interpretation of its policy and that talking to it is a waste of time." JX 38.

Dunnegan testified that he "did not want Dr. Rosenfeld" to "have to waste his time or his staff's time dealing with Aetna" by submitting forms that would have supported Dunnegan's request for a medical necessity waiver. Dunnegan Tr. 603:13-18. Instead, Dunnegan apparently decided it would be more efficient to file a lawsuit in federal court. Dunnegan's testimony on this point is not credible. It is simply implausible that Dunnegan believed that his only recourse was to file a class action lawsuit against Aetna to seek reimbursement for Effexor XR after Aetna advised him that he could seek a medical-necessity waiver. The Court draws the much more plausible inference on these facts, namely that Dunnegan chose not to take that modest administrative step because he wanted to preserve the opportunity to bring this purported class-action suit from which he, his family, and his firm stood to gain financially.

By email sent September 8, 2014, Dunnegan submitted a first-level appeal within Aetna challenging Aetna's decision about Effexor XR. JS ¶ 97; JX 39. By letter dated October 8, 2014, Aetna denied the appeal and advised Dunnegan that he could file a second-level appeal within Aetna. JS ¶ 98; JX 40. Dunnegan did not file any further internal appeals with Aetna. Fisher then sued Aetna on behalf of herself and all others similarly situated.

## II. CONCLUSIONS OF LAW

### A. Legal Background on New York Insurance Law

The health insurance industry is highly regulated. New York insurance law requires that the State approve health insurance policies offered for sale in New York. *See* N.Y. Ins. Law § 3201(b)(1) ("No policy form shall be delivered or issued for delivery in this state unless it has been filed with and approved by the superintendent as conforming to the requirements of this chapter

and not inconsistent with law."). New York insurance law also requires that any health insurance policy issued for delivery in New York State contain or closely resemble model language that set forth by statute. *See generally id.* § 3216(d)(1). Aetna cannot deviate from this language in its insurance policies. The Group Policy contained all the legally required language, while the Final Rates document did not. Thus, the Group Policy, rather than the Final Rates document—is the only document that satisfies the legal requirements for a health insurance contract under New York law.

New York insurance law also permits insurers to send customers a table or schedule of rates. By law,

> [e]very policy of life, accident or health insurance, or contract of annuity, delivered or issued for delivery in this state, shall contain the entire contract between the parties, and nothing shall be incorporated therein by reference to any writing, unless a copy thereof is endorsed upon or attached to the policy or contract when issued.

*Id.* § 3204(a)(1); *see also id.* § 3204(a)(2)-(3). But this subsection does "not apply to a table or schedule of rates, premiums or other payments which is on file with the superintendent for use in connection with such policy or contract." *Id.* § 3204(b). Aetna argues, and the Court agrees, that the Final Rates document complied with New York insurance law because it was a schedule of rates as authorized under section 3204(b).

### B. Claim for Breach of the Final Rates Document

By executing the Final Rates document on January 9, 2014, Dunnegan formed a contract with Aetna on behalf of D&S and that the material terms of this contract are those stated in the Group Policy. As noted above, DFS approved the material terms of the 2014 Aetna NY Silver Plan in October 2013, and the Final Rates document put Dunnegan on inquiry notice of those material terms. Dunnegan manifested his assent to those terms by returning the Final Rates document on

January 9, 2014.[7]  Dunnegan (on behalf of D&S) thus agreed to the terms of the 2014 Aetna NY

Silver Plan—which he received in the mail on February 19, 2014—by executing the Final Rates

document on January 9, 2014.  Because the Final Rates document included the Choose Generic

provision, that provision bound D&S after Dunnegan returned the Final Rates document on

January 9, 2014.  Aetna is therefore entitled to judgment on Fisher's first claim for breach of

contract.

### C. Claim for Breach of the Group Policy

The Court also denies summary judgment on Fisher's remaining claim for breach of the

Group Policy.  Fisher also argues that if terms of the Group Policy bind the parties, Aetna has

breached the Group Policy by refusing to provide any reimbursement for Effexor XR.  The parties

fully briefed that argument at the summary judgment phase of this litigation.  *See* Memorandum of

Law in Support of Plaintiff's Motion for Summary Judgment, Dkt No. 25, at 14-24; Memorandum

of Law in Opposition to Plaintiff's Motion for Summary Judgment, Dkt No. 30; Reply

Memorandum of Law in Further Support of Plaintiff's Motion for Summary Judgment, Dkt No. 37,

at 5-9.  Fisher presented additional arguments related to this topic in her proposed findings of fact

and conclusions of law before the Court's bench trial.  Plaintiff's Proposed Findings of Fact and

Conclusions of Law, Dkt No. 73, at 67-81.[8]

---

[7] As an aside, the Court observes that Aetna leans heavily on the fact that the SBC, the Formulary, and product brochures were available to Warner and Dunnegan when the parties entered the contract.  That is understandable, as these sources described the Choose Generic provision at the center of this case.  But the availability of these summary materials is irrelevant to the contract-formation issue.  It is a fundamental precept of contract law that there "must be an objective meeting of the minds . . . with respect to all material terms . . . to give rise to a binding and enforceable contract." *Tractebel Energy Mktg. v. AEP Power Mktg.*, 487 F.3d 89, 95 (2d Cir. 2007) (quotations omitted).  The SBC, the Formulary, product brochures and other summary plan descriptions are just that—summaries. *See, e.g.*, Pribush Tr. at 235:4-15 (Pribush testifying that the Health Connect summary is "similar to the SBC" because both are "very high-level document[s]").  These materials do not have all material terms of the 2014 Aetna NY Silver Plan.  Thus, whether Warner, Dunnegan, or anyone else associated with D&S had access to these summary documents is simply irrelevant to the terms of the parties' contract in this case.

[8] Because Defendant has not moved for judgment on Fisher's second claim, the Court cannot grant judgment for Defendant.  In its proposed findings of fact and conclusions of law submitted before the Court conducted the bench trial, Aetna reasonably noted that it understood that the Court's order soliciting pretrial briefing "contemplated submissions of proposed findings of fact and conclusions of law solely related to the issue of contract formation."  Dkt No. 77, at 1 n.1.

Fisher's motion for summary judgment on this claim is denied.  Under ERISA, if the plan administrator or fiduciary is granted discretionary authority under the plan to make eligibility determinations or construe the terms of the plan, judicial review is deferential and the reviewing court asks only if the administrator's conclusion is arbitrary and capricious.  *See Ocampo v. Bldg. Serv. 32B-J Pension Fund*, 787 F.3d 683, 690 (2d Cir. 2015) ("[W]here the written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, we will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious.") (quotation omitted); *see also Elizabeth Boey Chau, M.D. v. Hartford Life Ins. Co.*, No. 1:14-CV-8484-GHW, 2016 WL 7238956, at *2 (S.D.N.Y. Dec. 13, 2016) ("The term 'arbitrary and capricious' is used interchangeably with the phrase 'abuse of discretion,' and either describes the deferential standard applied when an ERISA plan reserves discretion for the administrator." (quotation omitted)).  The Group Policy contains the following provision:

> For the purpose of section 503 of Title 1 of the Employee Retirement Income Security Act of 1974, as amended (ERISA), We are a fiduciary with complete authority to review all denied claims for benefits under this Policy.  This includes, but is not limited to, the denial of certification of the medical necessity of hospital or medical treatment.  In exercising such fiduciary responsibility, We shall have discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under this Policy, the Certificate or any other document incorporated herein.  We shall be deemed to have properly exercised such authority unless We abuse our discretion by acting arbitrarily and capriciously.  We have the right to adopt reasonable policies, procedures, rules, and interpretations of this Policy to promote orderly and efficient administration.

JX 27 at 21.  This provision confers discretion on Aetna.  Thus, the Court would set aside Aetna's determination only if it is arbitrary and capricious.

A decision is arbitrary and capricious if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law" or "where [a] plan administrator or fiduciary has imposed a standard not required by the plan's provisions, or interpreted the plan in a manner inconsistent with its plain words."  *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999) (quotations and brackets omitted).  A reviewing court "may not upset a reasonable interpretation by

the administrator." *Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995).

If the parties offer "competing yet reasonable interpretations" of a policy, the reviewing court "must

accept [the interpretation] offered by the administrators." *Pagan v. NYNEX Pension Plan*, 52 F.3d

438, 443 (2d Cir. 1995).

The Second Circuit has "conclude[ed] that a district court's review under the arbitrary and

capricious standard is limited to the administrative record." *Miller v. United Welfare Fund*, 72 F.3d

1066, 1071 (2d Cir. 1995). "Courts have discretion, however, to admit evidence outside the record if

the plaintiff shows 'good cause' to do so." *Chau*, 2016 WL 7238956, at *2 (citing *Krauss v. Oxford

Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008)). "A demonstrated conflict of interest in the

administrative reviewing body is an example of 'good cause' that may, under certain circumstances,

warrant the introduction of additional evidence." *Id.* (quotation omitted); *see also DeFelice v. Am. Int'l

Life Assur. Co.* 112 F.3d 61, 67 (2d Cir. 1997). The Supreme Court has held that a "conflict of

interest exists for ERISA purposes when a plan administrator acts in the dual role of evaluating and

paying benefits claims[.]" *Chau*, 2016 WL 7238956, at *2 (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S.

105, 112-15 (2008)). But "[n]o weight is given to a conflict in the absence of any evidence that the

conflict actually affected the administrator's decision." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609

F.3d 133, 140 (2d Cir. 2010).[9] Because there is no evidence that any purported conflict of interest

had an impact on Aetna's decision here, the Court's review is limited to the administrative record

and the alleged conflict would bear minimal weight in the Court's analysis.

Aetna reasonably interpreted its policy with respect to Fisher's claims. In the Choose

Generic provision, the Group Policy provided that "[a]n additional charge may apply when a

Prescription Drug on a higher tier is dispensed at Your or Your Provider's request, when a

---

[9] Plaintiff appears to argue that the Second Circuit's decision in *Durakovic* conflicts with the Supreme Court's decision in *Glenn*. But *Durakovic* post-dates *Glenn*. Thus, even if the Court agreed with Plaintiff's interpretation of *Glenn* (which it does not), it must follow the Second Circuit's interpretation in *Durakovic*.

chemically equivalent Prescription Drug is available on a lower tier unless We approve coverage at the higher tier.  You will have to pay the difference between the cost of the Prescription Drug on the higher tier and the cost of the Prescription Drug on the lower tier."  JX 27.

As noted above, Fisher's doctor, Dr. Rosenfeld, submitted a medical exception request on January 29, 2014.  JX 30.  But this form did not so much as mention—much less request—a substitution of a brand-name drug for a generic.  Indeed, it did not mention venlafaxine, the generic equivalent of Effexor XR, at all.  The form certainly did not certify that such a substitution was medically necessary.  It is true that Dr. Rosenfeld certified that Effexor XR was "medically necessary" on the medical exception request.  *Id.*  But he did not certify Effexor XR was medically necessary in the relevant sense; that is, he did not certify that Effexor XR was medically necessary relative to the venlafaxine.  It is conceivable—indeed, perhaps likely—that Effexor XR was "medically necessary" compared to the other brand-name drugs Dr. Rosenfeld listed on the medical exception request.  But that does not mean that the Effexor XR was medically necessary compared to the chemically equivalent generic.

Aetna treated the submission as a "request for coverage," which it approved.  Fisher was then able to fill her prescriptions at her pharmacy with the benefit of Aetna's contracted rates at the pharmacy, which were lower than Fisher would have paid otherwise.  But Aetna did not approve— and Dr. Rosenfeld never requested—coverage "at the higher tier" as described in the Choose Generic provision.

Dunnegan never requested a waiver of the medical-necessity requirement on Fisher's behalf, though he knew that he could have.  On August 15, 2014, Dunnegan emailed Fisher "[i]f Rosenfeld (or possibly someone from his office) calls (800) 414-2386 and explains that you need the brand name, then they should approve it and pay it retroactively."  JX 36.  And in its August 18 email, Aetna directly advised Dunnegan that Fisher could seek a medical-necessity waiver of the Choose Generic provision.  JX 29 ("Since the plan has the Choose Generics clause with the additional

charges, we can try to get the clause waived by having the doctor submit verbally or in writing for a Brand Medically Necessary override.  If approved, then only the copay is charged." (emphasis omitted)).

At first, Dunnegan took steps that suggested he would seek a waiver.  He faxed Dr. Rosenfeld on August 19, requesting that he call Aetna "and see if [he] can make any progress with Aetna in paying for the Effexor[.]"  JX 37.  But then on August 21, Dunnegan directed Dr. Rosenfeld not to request a waiver.  JX 38 ("We have concluded that Aetna has no interest in making an honest interpretation of its policy and that talking to it is a waste of time.").  That decision is explicable only by reference to Dunnegan's interest in converting an administrative hassle into a potentially lucrative class-action lawsuit, with his life as lead plaintiff and his firm as plaintiff's counsel.  Fisher and Dunnegan may have avoided years of costly litigation if Dr. Rosenfeld had submitted a waiver request.  Of course, we will never know if Aetna would have approved a request for a waiver.

Because Plaintiff never sought a medical-necessity waiver, Aetna interpreted its policy to require her to pay an "additional charge" equal to the cost difference between the Effexor XR and venlafaxine.  In calculating Fisher's benefit, Aetna applied the lesser of (1) Fisher's copayment—fifty percent of the cost of Effexor XR—plus an "additional charge" of the brand-generic cost differential and (2) the full cost of Effexor XR.  Because the fifty percent copayment plus the cost differential was always higher than the brand cost, Aetna charged Fisher the brand price.  This was a reasonable interpretation of the Choose Generic provision.  Thus, even if Fisher's alternative construction of the Group Policy is also reasonable, the Court may not disturb Aetna's interpretation.

Fisher also argues that her charges for Effexor XR should be limited to the maximum annual out-of-pocket cost fixed by the Group Policy.  But the Group Policy provided that the "Out-of-Pocket Limit" does not include the "cost of health care services We do not Cover."  JX 27.  Under

the Group Policy, the brand-generic cost difference was an "additional charge."  Aetna thus interpreted the Group Policy to exclude coverage of the brand-generic cost differential.  Again, this is a reasonable interpretation that the Court may not disturb.

Fisher did not present the other arguments she presented on summary judgment in her internal Aetna appeal.  These arguments therefore are not in the administrative record.  The Court therefore cannot, and does not, consider these arguments.

Fisher's motion for summary judgment on this claim is denied.  As noted above, because Aetna has never moved for judgment on Fisher's claim for breach of the Group Policy, the Court cannot grant judgment in its favor at this stage.

## III. CONCLUSION

Aetna is entitled to judgment on Fisher's first breach of contract claim.  The parties are directed to submit a joint letter no later than two weeks from the date of this order with their proposal (or proposals, if the parties do not agree) for how to litigate Fisher's remaining claim.

SO ORDERED.

Dated:  May 29, 2020

_____
GREGORY H. WOODS
United States District Judge