UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JACQUELINE FISHER,                                      :

                                        Plaintiff,      :

                  -against-                             :            15 Civ. 283 (GHW)

AETNA LIFE INSURANCE COMPANY,                          :            ECF Case

                                        Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER MOTION
FOR JUDGMENT ON HER SECOND CLAIM FOR RELIEF


DUNNEGAN & SCILEPPI LLC
Attorneys for Plaintiff
350 Fifth Avenue, 76th Floor
New York, New York 10118
(212) 332-8300

Table of Contents

Table of Authorities ......................................................................................................... ii

Preliminary Statement ......................................................................................................1

Statement of Facts ............................................................................................................2

Argument ...........................................................................................................................2

    I.      AETNA'S REFUSAL TO REIMBURSE FISHER FOR THE DIFFERENCE
          IN COST BETWEEN (I) THE GENERIC EQUIVALENT OF HER
          BRAND-NAME DRUG AND (II) THE $10 COPAYMENT FOR THAT
          GENERIC EQUIVALENT WAS ARBITRARY AND CAPRICIOUS ................2

    II.     THE FEBRUARY 19 DOCUMENT AND THE ACA REQUIRE
          AETNA TO PROVIDE 100 PERCENT REIMBURSEMENT FOR
          THE AMOUNTS FISHER PAID FOR EFFEXOR XR® AFTER
          FISHER MET HER OUT-OF-POCKET LIMIT ........................................8

         A.     Fisher's Out-Of-Pocket Limit Under
              The February 19 Document Is $5,000 ........................................8

         B.     The Cost Of The Effexor XR® Should Count
              Towards Fisher's Out-Of-Pocket Limit ......................................16

         C.     Fisher Has Sustained Damages Of $2,737.62 ...........................18

Conclusion ......................................................................................................................18

Table of Authorities

**Cases**

*Brown v. Bd. of Trustees of Bldg. Serv. 32B-J Pension Fund*,
392 F. Supp.2d 434 (E.D.N.Y. 2005) ........................................................................... 7

*Canon Inc. v. Tesseron Ltd.*,
2015 WL 7308663 (S.D.N.Y. Nov. 19, 2015) ............................................................. 10

*Chevron, Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ................................................................................................... 15

*City of Arlington, Tex. v. F.C.C.*,
569 U.S. 290 (2013) ................................................................................................... 15

*Durgin v. Blue Cross & Blue Shield of Vermont*,
353 F. App'x 538 (2d Cir. 2009) ............................................................................... 10

*Fisher v. Aetna Life Ins. Co.*,
2017 WL 1246133 (S.D.N.Y. Mar. 31, 2017) .............................................. 1, 2, 6, 11

*Gallo v. Madera*,
136 F.3d 326 (2d Cir. 1998) ...................................................................................... 11

*Gates v. UnitedHealth Grp. Inc.*,
561 F. App'x 73 (2d Cir. 2014) ................................................................................. 10

*John Wiley & Sons, Inc. v. DRK Photo*,
882 F.3d 394 (2d Cir. 2018) ...................................................................................... 11

*Kinstler v. First Reliance Standard Life Ins. Co.*,
181 F.3d 243 (2d Cir. 1999) ...................................................................................... 10

*Lipin v. Hunt*,
538 F. Supp.2d 590 (S.D.N.Y. 2008) ......................................................................... 11

*McCauley v. First Unum Life Ins. Co.*,
551 F.3d 126 (2d Cir. 2008) ................................................................................... 10-11

*Miller v. United Welfare Fund*,
72 F.3d 1066 (2d Cir. 1995) ........................................................................................ 7

*Murphy v. First Unum Life Ins. Co.*,
2016 WL 526243 (E.D.N.Y. Feb. 9, 2016) ................................................................. 11

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005) ............................................................................................ 14-15

*New York v. F.E.R.C.*,
783 F.3d 946 (2d Cir. 2015) ..................................................................................... 15

*O'Diah v. New York City*,
2002 WL 1941179 (S.D.N.Y. Aug. 21, 2002) ............................................................ 11

*Quadrant Structured Products Co. v. Vertin*,
23 N.Y.3d 549, 16 N.E.3d 1165 (N.Y. 2014) ........................................................... 10

*Rappa v. Connecticut Gen. Life Ins. Co.*,
2007 WL 4373949 (E.D.N.Y. Dec. 11, 2007) .............................................................. 7

*Wilson v. Steinhoff*,
718 F.2d 550 (2d Cir. 1983) ..................................................................................... 11

**Statutes**

26 U.S.C. § 223 ........................................................................................... 12, 16, 17

42 U.S.C. § 18021 ...................................................................................................... 14

42 U.S.C. § 18022 ............................................................................................. *passim*

42 U.S.C. § 18041 ................................................................................................. 13-14

**Rules**

Local Rule 56.1 ............................................................................................................. 2

**Regulations**

45 C.F.R. § 156.130 .................................................................................................... 12

Notice of Benefit and Payment Parameters for 2016, Proposed Rule
79 Fed. Reg. 70723 (Nov. 26, 2014) ......................................................................... 12

Notice of Benefit and Payment Parameters for 2016, Final Rule
80 Fed. Reg. 10823 (Feb. 27, 2015) ..................................................................... 12, 15

iii

**Other**

FAQs about Affordable Care Act Implementation (Part XXVII)(May 26, 2015)
https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/
resource-center/faqs/aca-part-xxvii.pdf ...................................................................................... 13

Plaintiff Jacqueline Fisher ("Fisher") respectfully submits this memorandum in support of her motion for judgment against defendant Aetna Life Insurance Company ("Aetna") on her second claim for relief.

<u>Preliminary Statement</u>

 Assuming the February 19, 2014, Document (the "February 19 Document") is an enforceable contract[1], Fisher seeks damages as a matter of law based upon Aetna's failure to meet two of its obligations under it.

<u>First</u>, after Fisher met the deductible under the February 19 Document, and after Fisher continued to purchase a brand-name prescription drug, Effexor XR®, Aetna failed to meet its obligation to reimburse Fisher for the difference between (i) the cost of the generic equivalent of Fisher's brand-name drug, and (ii) the $10 copayment for that generic drug.  In a motion for summary judgment, in a substantially identical setting, Hon Richard J. Sullivan ruled that Aetna's denial of benefits for Effexor XR® was arbitrary and capricious. *Fisher v. Aetna Life Ins. Co.*, 2017 WL 1246133, at *5 (S.D.N.Y. Mar. 31, 2017)("*Fisher II*").  Aetna then reversed its earlier denial of benefits and provided Fisher with the reimbursement that she requested in this respect. (*Fisher II*, Dkt. 56-7 at 5/7)

<u>Second</u>, after Fisher met her Out-of-Pocket Limit, Aetna failed to reimburse Fisher for 100 percent of the cost of her brand-name prescription drug.  Aetna's failure to provide this reimbursement resulted from two errors in Aetna's analysis.  First, Aetna ignored the plain meaning of the February 19 Document by failing to recognize that Fisher's Out-of-Pocket Limit is her individual limit of $5,000, rather than the family limit of $10,000.  Second, Aetna ignored

---

[1] In an opinion and order dated May 29, 2020, the Court found that the February 19 Document was part of an insurance contract between Fisher and Aetna. (Dkt. 99 at 21-22/27) Fisher intends to appeal this ruling.  Accordingly, nothing in this motion for judgment concedes that the February 19 Document formed part of her contract with Aetna.

the federal law that, at that time, required an insurer fix its Out-of-Pocket Limit at no more than $5,000 per person and to count Fisher's payments for covered medication toward her Out-of-Pocket Limit.  While Aetna counted those expenses toward Fisher's deductible, Aetna failed to count them toward the Out-of-Pocket Limit.

Statement of Facts

Certain undisputed facts are set forth in the accompanying statement pursuant to Rule 56.1, which is based primarily upon the stipulation of the parties filed October 4, 2016. (Dkt. 63)[2]  The exhibits identified in the stipulation were received in evidence on March 8, 2017. (Dkt. 93 at Tr. 6:15-21)  In addition, annexed as Exhibit A to the declaration of William Dunnegan is the letter of Aetna to Fisher, dated April 3, 2018, which was filed in *Fisher II* at Dkt. 56-7.

Argument

I.

AETNA'S REFUSAL TO REIMBURSE FISHER FOR THE DIFFERENCE IN COST BETWEEN (I) THE GENERIC EQUIVALENT OF HER BRAND NAME DRUG AND (II) THE $10 COPAYMENT FOR THAT GENERIC EQUIVALENT WAS ARBITRARY AND CAPRICIOUS

The February 19 Document provides in applicable part:

"An additional charge may apply when a Prescription Drug on a higher tier is dispensed at Your or Your Provider's request, when a chemically equivalent Prescription Drug is available on a lower tier unless We approve coverage at the higher tier. **You will have to pay [i] the difference between the cost of the Prescription Drug on the higher tier and the cost of the Prescription Drug on the lower tier**. The difference must be paid **in addition to [ii] the lower tier Copayment** or Coinsurance." (Emphasis added.) (Dkt. 76-31 at F000244)

Under this language, once Fisher has met her Deductible, she must pay (i) the difference between the cost of the higher tier drug, Effexor XR®, and the cost of the lower tier, generic

---

[2] The stipulation was also filed as Exhibit A to the Joint Pretrial Statement filed on February 28, 2017, as Dkt. 85-1.

2

drug, Venlafaxine, and (ii) the copayment of the lower tier, generic drug.  For example, Fisher purchased Effexor XR® on June 30, 2014 for $506.40. (Dkt. 63 at ¶ 86)  The cost of the generic was at that time $35.68. (Dkt. 63 at ¶ 73)  The copay for the generic was $10. (Dkt. 63 at ¶ 74)  Thus, according to the language of the February 19 Document, after Fisher met her deductible, and before Fisher met her Out-of-Pocket Limit, Fisher was required to pay the difference between the cost of the Effexor XR®, $506.40, and the cost of the generic, $35.68, which equals $470.72, plus the copay for the generic, $10, which equals a total of $480.72.  Because Fisher paid $506.40, Aetna is required to reimburse Fisher for the difference between $506.40 and $480.72, which is $25.68.  Logically, Aetna must therefore pay the difference between (i) the cost of the generic drug equivalent to Effexor XR®, and (ii) the copayment for that generic drug. (In the above example, a simpler, and equally valid, calculation would be to subtract the copay for the generic, $10, from the cost of the generic, $35.68, which also yields $25.68.)  After Fisher met her deductible, and before she met her Out-of-Pocket Limit, the February 19 Document therefore requires Aetna to reimburse Fisher for $25.68 per month.

Although she was not testifying in her 30(b)(6) capacity at the time, Aetna's Rule 30(b)(6) witness, confirmed the accuracy of this method for calculating the reimbursement that Aetna must provide. (Dkt. 28-2 at 208:5 – 212:11)

Fisher made three unreimbursed payments of $25.68 for Effexor XR® after meeting the $4,000 family deductible and before reaching her individual Out-of-Pocket Limit. (Dkt. 63 at ¶ 86)  Accordingly, Fisher has, at a minimum, sustained damages of $77.04 as a result of Aetna's failure to provide this type of reimbursement.

Aetna's refusal to reimburse Fisher for this cost differential is arbitrary and capricious. As an initial matter, Fisher's use of Effexor XR® was covered, and therefore counted towards

the deductible.  On January 30, 2014, Aetna granted the coverage request of Fisher's physician, writing in a letter to the physician that "[b]ased on the review of information submitted, we have approved your request. We approved coverage of the medication you requested for this time period: 01/30/2014 – 01/30/2015." (Dkt. 76-36 at 2/3; Dkt. 63 at ¶ 79)  On January 30, 2014, February 28, 2014, April 1, 2014, and April 29, 2014, Fisher purchased Effexor XR® from an in-network pharmacy (Dkt. 63 at ¶ 81), and the pharmacy submitted claims to Aetna for those purchases. (Dkt. 63 at ¶ 81)  For each of those purchases, Aetna represented that it applied the full amount Fisher paid for the Effexor XR® to Fisher's deductible. (Dkt. 76-37 at F000045, F000053, F000066 and F000075)  On May 27, 2014, Fisher purchased Effexor XR® for $464.68 from the same pharmacy, and the pharmacy submitted a claim to Aetna for that amount. (Dkt. 63 at ¶ 83)  For that purchase, Aetna applied $45.97 of the purchase price towards Aetna's deductible, which Aetna considered to satisfy Fisher's deductible. (Dkt. 63 at ¶ 84)  After Aetna represented to Fisher that she had met her deductible, Fisher continued to buy Effexor XR® from the same pharmacy, and the pharmacy submitted claims for those amounts to Aetna. (Dkt. 63 at ¶ 86)  Aetna, however, never provided any coinsurance or reimbursement to Fisher for the amounts she paid for Effexor XR®. (Dkt. 63 at ¶ 90)

Aetna's calculation of the amount Fisher was required to pay for Effexor XR® is erroneous because it flatly contradicts the plain language of the February 19 Document.  The relevant language, is as follows:

> "An additional charge may apply when a Prescription Drug on a higher tier is dispensed at Your or Your Provider's request, when a chemically equivalent Prescription Drug is available on a lower tier unless We approve coverage at the higher tier. You will have to pay the difference between the cost of the Prescription Drug on the higher tier and the cost of the Prescription Drug on the lower tier. The difference must be paid in addition to the lower tier *Copayment* or Coinsurance." (Emphasis added.) (Dkt. 76-31 at F000244)

4

On September 8, 2014, Dunnegan e-mailed Aetna, appealing Aetna's decision to deny reimbursement to Fisher. (Dkt. 63 at ¶ 97, Dkt. 76-46)  In a letter dated October 8, 2014, Aetna denied Fisher's appeal. (Dkt. 63 at ¶ 98, Dkt. 76-47)  Aetna's denial acknowledged that it had approved Fisher's use of Effexor XR® for coverage (Dkt. 76-47 at 3/25), but appeared to insist that Fisher was required to pay the *cost* of the lower tier drug, $35.68,[3] even though the plain language of the February 19 Document, which Aetna quoted in its denial letter, specified that Fisher was required to pay the *copay* for the lower tier drug, which is $10.00. (Dkt. 76-47 at 4/25)  In this interpretation, Aetna changed the words of the February 19 Document from "[t]he difference must be paid in addition to the lower tier ***Copayment*** or Coinsurance," to "[t]he difference must be paid in addition to the lower tier ***cost***."

Per the Stipulation (Dkt. 63 at ¶¶ 89-90), however, Aetna applied the 50% copay of Effexor XR®, the standard for Tier III drugs.  But nothing in the February 19 Document quoted above mentions or refers to the copay of the higher tier drug.  In a scenario like this, where there is a generic equivalent of the higher tier drug available, the copay for the higher tier drug is irrelevant.  The calculation in the February 19 Document applies the ***cost*** (not copay) of the higher tier and lower tier drugs and the copay of the ***lower tier*** drug, but does not apply the ***copay*** of the ***higher tier*** drug.  Under this interpretation, Aetna effectively changed the sentence "[t]he difference must be paid in addition to the ***lower tier*** Copayment or Coinsurance" to read "[t]he difference must be paid in addition to the ***higher tier*** Copayment or Coinsurance."

In addition, Aetna applied an additional rule that does not appear in the February 19 Document.  Per ¶ 90 of the Stipulation, Aetna agrees that, if it applied its reading of the February

---

[3] "The copay for the Effexor XR 150mg (RX 0473847) filled on June 30, 2014, July 31, 2014 and August 27, 2014 was $35.68 and the copay plus the difference in the brand and generic cost is $470.72 for a total copayment to you of $506.40 for each date." (Dkt. 76-47 at 3/25)

19 Document, and required Fisher to pay the copay for the higher tiered drug, it would have charged Fisher $661.34 for a purchase of $464.68, representing the cost difference of $429 plus the 50 percent copay. (Dkt. 63 at ¶ 90)  Aetna writes "because the brand negotiated rate was less than the 50% copay plus the brand-generic cost differential, Aetna charged Fisher the lesser amount − the brand price of $464.68." (Dkt. 63 at ¶ 90)  But nothing in the February 19 Document allowed Aetna to make such a cost adjustment.  Instead, Aetna simply made up a new rule.

On a virtually indistinguishable record[4], Judge Sullivan held that Aetna's denial of benefits for Effexor XR® was "arbitrary and capricious." (*Fisher v. Aetna Life Ins. Co.*, 2017 WL 1246133, at \*5-6 (S.D.N.Y. Mar. 31, 2017)  There, as in the present case, Fisher challenged Aetna's interpretation of the copay requirement. (*Fisher II*, Dkt. 19-2 at 2/5)  There, as in the present case, Aetna had interpreted the Choose Generic clause to mean that Fisher was required to pay the cost of the lower tier drug even though the clause explicitly states that Fisher is required to pay the copay for the lower tier drug. (*Fisher II*, Dkt. 19-3 at 3/8)[5]

---

[4] The relevant clause in the *Fisher II* Contract is virtually identical to the clause in the February 19 Document:

"An additional charge may apply when a Prescription Drug on a higher tier is dispensed at Your or Your Provider's request, when a chemically equivalent Prescription Drug is available on a lower tier unless We approve coverage of the higher tier. You will have to pay the difference between the cost of the Prescription Drug on the higher tier and the cost of the Prescription Drug on the lower tier. The cost difference must be paid in addition to the lower tier Copayment or Coinsurance. The cost difference does not apply toward your Out-of-Pocket Limit." (*Fisher II*, Dkt. 18-5 at 15/51)

[5] "On May 27, 2015, Franklyn's Pharmacy submitted a claim for Effexor XR Cap 150 MG for a quantity of 60 capsules for a 30-day supply. You were charged $540.11. You were charged an $18.04 in copayment plus $522.07 (DAW) penalty for a total of $540.11 out-of-pocket cost."

Judge Sullivan then held that Aetna's denial of benefits was "arbitrary and capricious," and remanded the case back to Aetna. *Fisher v. Aetna Life Ins. Co.*, 2017 WL 1246133, at *6 (S.D.N.Y. Mar. 31, 2017)("Given the requirement that Aetna's decision, as plan administrator, be rational and not arbitrary, and that the decision to terminate benefits must be more than just 'conceivably' supported by the factual record, *Rappa* [*v. Connecticut Gen. Life Ins. Co.*], 2007 WL 4373949, at *9 [(E.D.N.Y. Dec. 11, 2007)], the Court finds that the record does not establish that Aetna's decision 'was based on a consideration of the relevant factors.' *Miller* [*v. United Welfare Fund*], 72 F.3d [1066] at 1072 [(2d Cir. 1995)]. Nor is it clear that, in reaching its conclusion, Aetna considered 'all of plaintiff's circumstances,' *Brown v. Bd. of Trustees of Bldg. Serv. 32B-J Pension Fund*, 392 F. Supp.2d 434, 445 (E.D.N.Y. 2005), or based its decision on substantial evidence. Because the Court is unable to determine the basis for Aetna's decision to apply the cost of Plaintiff's purchases of Effexor to her deductible but not to her out-of-pocket limit, or whether that decision was made in error, the Court has little choice but to conclude that Aetna's denial of Plaintiff's appeal was arbitrary and capricious.").

On remand, Aetna admitted that its interpretation of the clause, which stated that Fisher was required to pay a copay equal to the cost of the lower-tier drug was incorrect.  Aetna wrote:

> "On May 27, 2015, Franklyn's Pharmacy submitted a claim for Effexor XR Cap 150 MG for a quantity of 60 capsules for a 30-day supply. You were charged $540.11. You were charged an $18.04 copayment, plus $522.07 (DAW penalty) for a total of $540.11 out-of-pocket cost. Based on our review, the copay applied should have been $10.00 for a total out-of-pocket cost of $532.07. Therefore, we are reimbursing the $8.04 difference between the $18.04 copay originally applied and the $10.00 generic copay…Your pharmacy claims for Effexor XR Cap 150 MG applied the incorrect copay according to the terms and conditions of your plan. Therefore, Aetna is overturning the case, and issuing reimbursement in the amount of $64.32 for the incorrect copay that was originally applied." (Dunnegan Dec. Ex. A at 4-5/7)(*Fisher II*, Dkt. 57-6 at 4-5/7)

Aetna therefore reversed its decision denying Fisher reimbursement, and reimbursed Fisher for $64.32, representing a reimbursement of $8.04 for each purchase of Effexor XR® that took place after Fisher met her deductible.

If Aetna avoids liability with respect to Fisher's claims concerning the individual Out-of-Pocket Limit, addressed in Point II below, the amount of Aetna's liability under this theory would increase by $25.68 for each additional month in which Fisher made an unreimbursed payment for Effexor XR®, after meeting the $5,000 individual Out-of-Pocket Limit.  Fisher made four such unreimbursed payments of $25.68, for an additional $102.72.  Thus, if Aetna avoids liability with respect to Fisher's claims concerning the Out-of-Pocket Limit, Aetna's liability under this theory would increase to $179.76.

II.

THE FEBRUARY 19 DOCUMENT AND THE ACA REQUIRE AETNA TO PROVIDE 100 PERCENT REIMBURSEMENT FOR THE AMOUNTS FISHER PAID FOR EFFEXOR XR® AFTER FISHER MET HER OUT-OF-POCKET LIMIT

Both the February 19 Document and the Affordable Care Act ("ACA") limit the amount the beneficiary must pay, out of his or her own pocket, for covered costs before the insurance company must pay 100 percent of additional covered costs.  This is the Out-of-Pocket Limit.

To determine Fisher's claim for additional reimbursement, the Court should address three questions: (i) What is Fisher's Out-of-Pocket Limit? (ii) Does the ACA require Aetna to count the cost of the Effexor XR® towards the Out-of-Pocket Limit? and (iii) What is the amount that Aetna must reimburse Fisher after she reached the Out-of-Pocket Limit?

A.    <u>Fisher's Out-Of-Pocket Limit Under The February 19 Document Is $5,000.</u>

The plain language of the February 19 Document provides that an individual, even an individual with family coverage, only needs to meet the individual Out-of-Pocket Limit of

8

$5,000 before Aetna must provide 100 percent of the remaining covered costs for that individual.

The February 19 Document provides:

> "D. Out-of-Pocket Limit.
>
> When **You** have met your In-Network Out-of-Pocket Limit in payment of In-Network Deductibles, Copayments, and Coinsurance for a Plan Year in the Schedule of Benefits in section XIV of this Certificate, We will provide coverage for 100% of the Allowed Amount for Covered in-network Services for the remainder of that Plan Year. If other than Individual coverage applies, when persons of the same family covered under this Certificate have collectively met the family In-Network Out-of-Pocket Limit in payment of In-Network Deductibles, Copayments and Coinsurance for a Plan Year in the Schedule of Benefits, We will provide coverage for 100% of the Allowed Amount of the rest of that Plan Year." (Emphasis added.)(Dkt. 76-30 at 36/39)

The plain language of this paragraph requires only that an individual – even a member of a family – meet the individual Out-of-Pocket Limit before being entitled to 100 percent reimbursement for further covered costs.  This paragraph has two sentences.  The plain meaning of the first sentence is that Aetna must provide 100 percent reimbursement for covered services for an individual ("You") after he or she meets the individual ("your") Out-of-Pocket Limit of $5,000.  The plain meaning of the second sentence is that Aetna must provide 100 percent reimbursement for covered services for all individuals in a family, after the individuals in the family collectively reach the family Out-of-Pocket Limit of $10,000.  Plainly the language provides that the member can take advantage of either the individual limit or the family limit.

Moreover, the structure of the February 19 Document demonstrates that Aetna did not intend to require individual family members to meet the family Out-of-Pocket Limit before being entitled to 100 percent reimbursement.  Aetna's requirements for the Deductible, which appear on the same page, explicitly provide that individuals in a family must meet the family Deductible before receiving any co-insurance coverage.  The February 19 Document provides:

"A. Deductible

Except where stated otherwise, You must pay the amount in the Schedule of Benefits in section XIV of this Certificate for Covered in-network and out-of-network Services during each Plan Year before We provide coverage. **If You have other than individual coverage, You must pay the family Deductible in the Schedule of Benefits for Covered Services under this Certificate during each Plan Year**. However, after Deductible payments for any and all persons covered under this Certificate collectively total the family Deductible amount in the Schedule of Benefits in a Year, no further Deductible will be required for any person covered under this Certificate for that Plan Year." (Emphasis added.) (Dkt. 76-30 at 36/39)

Thus, if Aetna intended to require individuals with family coverage to meet the family

Out-of-Pocket Limit, Aetna would have used the same language that it used, in the previous

paragraph, for the Deductible. *See Quadrant Structured Products Co. v. Vertin*, 23 N.Y.3d 549,

560, 16 N.E.3d 1165, 1172 (N.Y. 2014)("if parties to a contract omit terms - particularly, terms

that are readily found in other, similar contracts - the inescapable conclusion is that the parties

intended the omission. The maxim *expressio unius est exclusio alterius,* as used in the

interpretation of contracts, supports precisely this conclusion."); *Canon Inc. v. Tesseron Ltd.*, 14

Civ. 5462 (DLC), 2015 WL 7308663, at *7 (S.D.N.Y. Nov. 19, 2015)(quoting *Quadrant*, *Id.*).

If Aetna interpreted any provision of the February 19 Document contrary to its plain

meaning, that interpretation would be arbitrary and capricious. *Gates v. UnitedHealth Grp. Inc.*,

561 F. App'x 73, 75-76 (2d Cir. 2014)("Applying the 'arbitrary and capricious' standard, a court

reverses a discretionary interpretation 'only if the decision is without reason, unsupported by

substantial evidence or erroneous as a matter of law,' or 'where [a] plan administrator or

fiduciary has imposed a standard not required by the plan's provisions, or interpreted the plan in

a manner inconsistent with its plain words.'")(quoting *Kinstler v. First Reliance Standard Life

Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999)); *Durgin v. Blue Cross & Blue Shield of Vermont*, 353

F. App'x 538, 539 (2d Cir. 2009)("BCBS's atextual requirement therefore 'impose[d] a standard

not required by the plan's provisions,' [*McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008)] (internal quotation marks omitted), and accordingly was arbitrary and capricious."); *Murphy v. First Unum Life Ins. Co.*, 15 Civ. 820 (SJF)(SIL), 2016 WL 526243, at *4 (E.D.N.Y. Feb. 9, 2016)("The administrator's decision is arbitrary and capricious if it imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain words.")(internal quotation omitted). "Even when trustees of a pension plan are entitled to deference in interpreting the terms of the plan, deference cannot be so broad as to permit them to graft additional requirements onto unambiguous plan definitions." *Gallo v. Madera*, 136 F.3d 326, 330 (2d Cir. 1998).

In *Fisher II*, Judge Sullivan did find that the policy required that the individual must meet the family Out-of-Pocket Limit before receiving 100 percent reimbursement. *Fisher II*, Dkt. 77 at 9/14. Collateral estoppel, however, should not apply to this finding because no final judgment has been entered and an appeal is planned. *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 406 n. 5 (2d Cir. 2018)("Here, exercising our discretion, we decline to apply collateral estoppel against DRK for several reasons…Third, DRK may yet choose to challenge the Ninth Circuit decision through a petition for certiorari: the Ninth Circuit decision, as of this writing, is not yet final."); *Wilson v. Steinhoff*, 718 F.2d 550, 552 (2d Cir. 1983)("The doctrine of collateral estoppel may be invoked only where an issue of fact or law has been litigated and determined by a valid and final judgment and the determination was essential to the judgment."); *O'Diah v. New York City*, 02 Civ. 274 (DLC), 2002 WL 1941179, at *4 (S.D.N.Y. Aug. 21, 2002)("A judgment must be final in order to have preclusive effect, and finality for purposes of *res judicata* is generally the same as that required for appealability under the final judgment

rule."); *Lipin v. Hunt*, 538 F. Supp.2d 590, 599 (S.D.N.Y. 2008)("Because of the pending appeal, that decision is not yet final and does not yet have preclusive effect.").

Accordingly, the Court should find that Fisher's Out-of-Pocket Limit under the February 19 Document is $5,000.

In any event, the ACA prevents Aetna from imposing on Fisher an Out-of-Pocket Limit greater than $5,000. The ACA refers to the Out-of-Pocket Limit as the "annual limitation on cost sharing." 42 U.S.C. § 18022(c) sets forth this limitation and the formula used to calculate it. 42 U.S.C. § 18022(c) states:

> "(c)     Requirements relating to cost-sharing
>
> (1)     Annual Limitation on cost-sharing
> (A) 2014
> The cost-sharing incurred under a health plan with respect to self-only coverage
> or coverage other than self-only coverage for a plan year beginning in 2014 shall
> not exceed the dollar amounts in effect under section 223(c)(2)(A)(ii) of title 26
> for self-only and family coverage, respectively, for taxable years beginning in
> 2014.

26 U.S.C. § 223(c)(2)(A)(ii) in turn provides that:

> "(ii)    the sum of the annual deductible and the other annual out-of-pocket expenses
> required to be paid under the plan (other than for premiums) for covered benefits
> does not exceed—
>
> (I) $5,000 for self-only coverage, and
>
> (II) twice the dollar amount in subclause (I) for family coverage."

Thus, pursuant to 42 U.S.C. § 18022(c) and 26 U.S.C. § 223(c)(2)(A)(ii), for the plan year 2014, the Out-of-Pocket Limit for individuals was $5,000.

At best for Aetna, the plain language of the statute is ambiguous as to whether an individual in a family must meet the individual or the family Out-of-Pocket Limit before the insurer must pay 100 percent of the additional covered amounts. HHS, however, has clarified

that the statute means that an individual, even a member of a family, need only meet the individual Out-of-Pocket Limit.  On November 26, 2014, HHS proposed this clarification of the statute for public comment:

> "In addition to the above proposed changes to § 156.130, we also propose clarifying that the annual limitation on cost sharing for self-only coverage applies to all individuals regardless of whether the individual is covered by a self-only plan or is covered by a plan that is other than self-only. In both of these cases, an individual's cost sharing for the [essential health benefits] may never exceed the self only annual limitation on cost sharing."

Notice of Benefit and Payment Parameters for 2016, 79 Fed. Reg. 70723 (Nov. 26, 2014).  After a period of notice and comment, HHS finalized this clarification of its interpretation of the statute.

> "Lastly, in the proposed rule, we proposed clarifying that the annual limitation on cost sharing for self-only coverage applies to all individuals regardless of whether the individual is covered by a self-only plan or is covered by a plan that is other than self-only...*Response:* We believe that this clarification is an important consumer protection, as we are aware that some consumers have been confused by the applicability of the annual limitation on cost sharing in other than self-only plans. Therefore, we are finalizing this clarification. **The annual limitation on cost sharing for self-only coverage applies to all individuals regardless of whether the individual is covered by a self-only plan or is covered by a plan that is other than self-only**....We note that 2016 plans must comply with this policy." (Emphasis added.)

Notice of Benefit and Payment Parameters for 2016, 80 Fed. Reg. 10823-25 (Feb. 27, 2015).  On May 26, 2015, the Department of Labor ("DOL") and the Department of the Treasury ("Treasury") endorsed this interpretation of the statute in guidance published on the Department of Labor website in conjunction with HHS.[6]

While HHS, DOL, and Treasury have opted not to administratively enforce this provision during the 2015 policy year, the meaning of the ACA, not the discretion of the administrative agencies, controls Fisher's rights.  HHS's decision to give insurers a two-year grace period

---

[6] https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-xxvii.pdf.

before administratively enforcing the statute does not change the meaning of the statute, or

Fisher's rights.

HHS had authority to issue this clarification.  Congress has entrusted HHS to apply 42

U.S.C. § 18022(c). 42 U.S.C. § 18041(a) states:

> "(a) Establishment of standards
> (1) In general
> The Secretary shall, as soon as practicable after March 23, 2010, issue regulations setting standards for meeting the requirements under this title, and the amendments made by this title, with respect to—
> ...
> (B) the offering of qualified health plans through such Exchanges;
> ...
> (D) such other requirements as the Secretary determines appropriate."

Section 18041(a)(1) represents a broad delegation of rulemaking authority to HHS.  "This

title" refers to Title I of the ACA, "Quality, Affordable Health Care for All Americans."  Section

18041(a)(1)(B) specifically delegates to HHS the responsibility for issuing regulations with

respect to "the offering of qualified health plans."  42 U.S.C. § 18021(b) defines a "qualified

health plan," *inter alia*, as a health plan that "provides the essential health benefits package

described in section 18022(a) of this title."  Section 18022(a) defines "essential health benefits

package" as coverage that, *inter alia* "(2) limits cost-sharing for such coverage in accordance

with [42 U.S.C. § 18022] (c)."  Section 18022(c) sets out the cost-sharing requirement, including

the Out-of-Pocket Limit.  Thus, Congress has specifically delegated to HHS the authority to

issue regulations concerning the cost-sharing limitation of 42 U.S.C. § 18022(c).  Additionally,

42 U.S.C. § 18041(a)(1)(D) provides HHS with broad authority to issue "such other

requirements as the Secretary determines appropriate" for meeting the requirements under Title

I.  The plain meaning of this statute allows HHS to promulgate additional requirements under

Title I of the ACA, as HHS sees fit.

To the extent that the statute is ambiguous, HHS's interpretation of the statute should be entitled to a high level of deference. *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005)("If a statute is ambiguous, and if the implementing agency's construction is reasonable, [*Chevron, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)] requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation. *Id.*, at 843–844, and n. 11, 104 S.Ct. 2778."). "No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority*." *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 297 (2013)(Emphasis in original). "That inquiry is deferential, asking only whether the agency's interpretation is 'reasonable,' while 'respect[ing] legitimate policy choices' made by the agency." *New York v. F.E.R.C.*, 783 F.3d 946, 954 (2d Cir. 2015)(quoting *Chevron* at 843-44).

HHS's interpretation, that an individual in a family only needs to meet the individual Out-of-Pocket Limit, is fully consistent with the basic purposes of the ACA. The cost-sharing limitation is a consumer protection provision designed to limit the annual costs of insured persons. 80 Fed. Reg. 10823, 10824-25 (Feb. 27, 2015)("We believe that this clarification is an important consumer protection, as we are aware that some consumers have been confused by the applicability of the annual limitation on cost sharing in other than self-only plans.") Nothing in the statute suggests Congress intended to require individuals in families meet a higher Out-of-Pocket Limit than individuals who are not in families. Common fairness suggests that an individual should not be punished with a higher Out-of-Pocket Limit simply because that individual is part of a family.

Thus, under the ACA, the most Aetna could require Fisher to pay is $5,000 before Aetna assumed 100 percent of the remaining costs in the plan year.

B.   <u>The Cost Of The Effexor XR® Should Count Towards Fisher's Out-Of-Pocket Limit.</u>

Once the Court determines that either the contractual or statutory individual Out-of-Pocket Limit applies, the next question is: does the amount that Fisher pays for Effexor XR® count towards her Out-of-Pocket Limit?

42 U.S.C. § 18022(c)(3) provides:

"(A) In general

      The term 'cost-sharing' includes—
      (i) deductibles, coinsurance, copayments, or similar charges; and
      (ii) any other expenditure required of an insured individual which is a qualified medical expense (within the meaning of section 223(d)(2) of Title 26) with respect to essential health benefits covered under the plan.

(B) Exceptions
      Such term does not include premiums, balance billing amounts for non-network providers, or spending for non-covered services."

The statute provides two levels of analysis: (1) are payments for Effexor XR® "cost-sharing?" and, if so, (2) does the "cost-sharing" fall within an exception?

Fisher's payments for Effexor XR®, a prescription drug, are "cost-sharing" within the meaning of this section, for three reasons.  First, those payments are a "copayment" or "coinsurance."  The February 19 Document describes Fisher's obligations to pay for Effexor XR® in the section labeled "Cost-Sharing Expenses." (Dkt. 76-31 at F000244)  The February 19 Document describes the fees that beneficiaries must pay for prescription drugs as "copayments" and "coinsurance," the terms used by § 18022(c)(3)(A)(i). (Dkt. 76-31 at F000244; Dkt. 76-32 at 36/38)  The February 19 Document states "You will have to pay the difference between the cost of the Prescription Drug on the higher tier and the cost of the Prescription Drug on the lower tier.

The cost difference must be paid in addition to the lower tier Copayment or Coinsurance." (Dkt. 76-31 at F000244)  The second quoted sentence provides that the "cost difference," which must be paid in addition to the "lower tier Copayment or Coinsurance," is itself a "copayment" or "coinsurance."  In its denial letter, Aetna described the "copay plus the difference in the brand and generic cost" as a "total copayment to you of $506.40." (Dkt. 76-47 at 3/25)

Second, if the "cost difference" is not a "copayment" or "coinsurance" under the ACA, the "cost difference" is a "similar charge."  Every example in § 18022(c)(3)(A)(i) refers to money the beneficiary pays for covered services pursuant to an insurance contract.  The amount of money that Fisher paid her pharmacy for covered prescription drugs is certainly similar, if not identical, to a copayment or coinsurance.

Third, if the "cost difference" were not a "similar charge," it meets the catchall provision of § 18022(c)(3)(A)(ii).  This catchall provision includes "any other expenditure required of an insured individual which is a qualified medical expense (within the meaning of section 223(d)(2) of Title 26) with respect to essential health benefits covered under the plan."  26 U.S.C. § 223(d)(2) includes within the definition of "qualified medical expense" an amount paid for medicine or a drug "if such medicine or drug is a prescribed drug."  Because her physician prescribed it, Fisher's Effexor XR® meets the requirement of a "qualified medical expense."

For the second level of analysis, Fisher's payments for Effexor XR® do not fall into any of the exceptions in § 18022(c)(3)(B) for "premiums, balance billing amounts for non-network providers, or spending for non-covered services."  Fisher's payments for Effexor XR® are not "premiums," because premiums are the amount that the insured pays for the insurance coverage. Fisher's payments for Effexor XR® are not "balance billing amounts for non-network providers," because Fisher purchased Effexor XR® from an In-Network provider. (Dkt. 63 at ¶ 80)  Fisher's

payments for Effexor XR® are not "spending for non-covered services" because (1) Aetna approved coverage of Fisher's use of Effexor XR® (Dkt. 63 at ¶ 77; Dkt. 76-36 at 2/3); (2) Aetna admitted in its denial letter that Fisher's use of Effexor XR® was covered (Dkt. 76-47 at 3/25); (3) Fisher obtained her Effexor XR® pursuant to the February 19 Document and received the benefit of Aetna's rate, which is lower than the price of the Effexor XR® on the open market (Dkt. 76-37 at F000045, F000053, F000066 and F000075; Dkt. 76-38 at F000086, F000092, F000101, F000109, F000115, F000124, F000132, F000138) and (4) Aetna counted Fisher's payments for Effexor XR® towards her deductible (Dkt. 76-37 at F000045, F000053, F000066, F000075 and F000086), which Aetna would only do if Fisher's Effexor XR® was a covered service (Dkt. 76-30 at 36/39).

C.      Fisher Has Sustained Damages Of $2,737.62.

        After meeting her Out-of-Pocket Limit, Fisher spent $2,660.58 in 2014 on Effexor XR®. (Dkt. 27-10)  Including the $77.04 that Aetna owes Fisher in reimbursement concerning the copay for the lower tier drug, Fisher has therefore sustained damages of $2,737.62, and should be entitled to summary judgment on her second individual claim for relief in that amount.

Conclusion

        For the reasons set forth above, Fisher respectfully requests that the Court grant her

motion for judgment on Claim 2 of her complaint.

Dated: New York, New York
      July 6, 2020

                        DUNNEGAN & SCILEPPI LLC

                        By *William Dunnegan*

                         William Dunnegan (WD9316)
                         wd@dunnegan.com
                         Richard Weiss (RW4039)
                         rw@dunnegan.com
                        Attorneys for Plaintiff
                        350 Fifth Avenue, 76th Floor
                        New York, New York 10118
                        (212) 332-8300